**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Robert E. COOLEY; Ronald L. Taylor; Gary P. Leber; Merri W. Turner, also known as Merrie Foutz; and Charles W. Matson, Defendants–Appellants.**

Nos. 92–3076, 92–3081 and 92–3084 to 92–3086.

United States Court of Appeals, Tenth Circuit.

July 19, 1993.

Rehearing Denied Aug. 16, 1993.

Lee Thompson, U.S. Atty., Wichita, KS, for plaintiff-appellee.

Craig Shultz of Shultz, Webb & Lonker, Wichita, KS, for defendants-appellants, Cooley and Taylor.

Steven K. Gradert, Asst. Federal Public Defender, Wichita, KS (Charles D. Anderson, Federal Public Defender, Wichita, KS, and Gregory E. Skinner, Asst. Federal Public Defender, Topeka, KS, with him on the briefs) for defendants-appellants, Leber, Matson, and Turner.

Before ANDERSON, BALDOCK, and KELLY, Circuit Judges.

STEPHEN H. ANDERSON, Circuit Judge.

The defendants-appellants in these cases are abortion protesters who were arrested after they climbed a fence and sought to

**988**

block access to a Wichita, Kansas, medical clinic. They were charged and subsequently convicted by a jury of violating 18 U.S.C. § 1509, which makes it a misdemeanor for any person, by threat or force, willfully to prevent, obstruct, impede, or interfere with, or willfully attempt to prevent, obstruct, impede, or interfere with, the performance of duties under any order, judgment, or decree of the United States. Among the issues raised in these appeals, the defendants contend that (1) the evidence was insufficient to support a conviction; (2) the jury instructions improperly permitted the jury to impute individual guilt from the cumulative actions of others; (3) the indictment was improperly obtained; and (4) the district judge should have disqualified himself, pursuant to 28 U.S.C. § 144 or § 455(b)(1), due to personal bias against the parties, or, pursuant to 28 U.S.C. § 455(a), because his impartiality could reasonably be questioned. We find no merit in any of these claims except that related to disqualification. As to that issue, we conclude that the district judge should have disqualified himself under 28 U.S.C. § 455(a) because his impartiality might reasonably have been questioned as a result, among other things, of his appearance on the nationally televised evening program "Nightline." Accordingly, we vacate the conviction and sentence of each defendant, and we remand these cases to the district court for reassignment to another judge, and a new trial.

## I.

## BACKGROUND

In the summer of 1991, national anti-abortion leaders chose Wichita, Kansas, as the site of a "summer of mercy" protest, directed at certain medical clinics which performed abortions (legal under Kansas law). Hundreds, perhaps thousands, of protesters participated at one time or another. Their general tactics included attempts physically to block entrances to the clinics so as to "rescue" fetuses by denying entrance to anyone seeking an abortion. On application by the clinic owners, the federal district court issued a temporary restraining order, followed by a preliminary injunction on August 5, 1991,

enjoining Operation Rescue leaders by name, and all acting in concert with them, from, *inter alia,* blocking access to and egress from specified medical facilities. The Tiller medical clinic, where the events underlying this case took place, was one of the facilities protected by the injunction. The court ordered United States Marshals to enforce the injunction. Intense local and national publicity and debate followed.

Many arrests occurred during the summer, some by local police officers, and some by the Marshals. The district judge who issued the injunction heard various matters involving certain of the protesters and their leaders. The judge was subjected throughout this time to death threats and other threats and intimidations. Cooley R.Supp. Vol. V at 613. The judge learned at the outset that the protesters intended willfully to violate his orders. Taylor R.Supp. Vol. I at 26. He gained more information about actual and anticipated violations of his order through matters coming before him in connection with the actions of the protesters. As a result, he became "adamant and vocal" in stating that his order was going to be obeyed. Cooley R.Supp. Vol. V at 614.

On August 20, 1991, the protesters, by prearrangement, attempted a new tactic. The events on that day were considerably different than they had been on prior days. United States Marshal Kent Pekarek testified that the Marshals and police officers were usually given advance notice of how many protesters they could expect and what techniques the protesters intended to use. However, the "[n]ight before [August 20] we received no information at all [about] what clinic they were going to try to block, as to their techniques, as to how many. We received nothing at all, and we contacted our sources and no one was talking." Cooley R.Supp. Vol. III at 212. Moreover, the atmosphere on the morning of August 20 was unusually quiet:

[G]enerally witnesses in the crowd who are curious onlookers will hear discussions in the crowd and tell—the information will get to us as to what may be happening, and that didn't happen that morning either. They usually ... block the clinics

like at 8:00 or 9:00 o'clock in the morning. Nothing was happening that morning [of August 20].

*Id.*

Shortly after noon on August 20, about forty protesters, including the defendants, scaled the fences and walls surrounding the Tiller clinic and rushed the gates from the interior, thereby blocking access to the clinic from the inside. Some of the protesters pushed and shoved on the gates, and at least one carried a locking device designed to be placed on the clinic gates. *Id.* at 216, 311. Both Marshal Pekarek and Deputy Amico testified that this event was entirely new, unanticipated and different from other attempts to block access to the clinic. *Id.* at 216–17, 310–12. They further testified that the moblike atmosphere hampered their ability to perform their duties, and caused them fear of immediate personal harm and danger to their own well being. *Id.* at 217–21; 327–29.

The evidence offered at trial demonstrates that each defendant in this case intentionally participated in the activities of August 20, that each scaled the fence or entered the grounds through an entrance shortly after noon, and that each sought to block access to the clinic from inside the grounds.

### Gary Leber

Leber came to Wichita on August 19 "to become part of what was going on." Cooley R.Supp. Vol. IV at 425. He testified that he was "among the group [that] went over the fence," and that he "ran around toward the gate area on the inside and sat down, and then laid down." *Id.* at 428–29. His purpose was to "place [his] body in the driveway so that the gate could not be opened so people could not enter or leave the premises." *Id.* at 436. He further testified that he knew that the U.S. Marshals were there "to maintain access or order," *id.* at 437, and had heard a "rumor of certain ... heavy federal charges." *Id.* at 438.

### Charles Wesley Matson

Matson arrived in Wichita on August 18. He testified that he "felt led to come to Wichita" after watching television news reports in which Judge Kelly and others had made comments. *Id.* at 442. On August 20, while picketing outside the clinic, he heard that "some people were going to block the gate ... from the inside" and that "someone was going to give some kind of signal." *Id.* at 441. When he saw people begin to run up and jump over the fence, he "laid down [his] sign and ... followed those people over." *Id.* at 442. After he went over the concrete fence on the north side of the clinic, Matson was approached by a U.S. Marshal who told him to sit down, which he did. *Id.* at 442–43.

### Robert Cooley

Cooley arrived in Wichita on the morning of August 19. He attended an informational meeting with Operation Rescue on the evening of the August 19. *Id.* at 459. At that time, he decided to participate in the plan to enter the inside of the clinic grounds. *Id.* at 459–60. He was told at the meeting that "there was an order in place." *Id.* at 456. On August 20, he hopped over the fence, ran through the parking lot on the interior of the clinic property, and headed toward the gate. *Id.* at 452. He testified that "from the very early moments of that thing, I think it was fairly plain ... what our objectives were, and that was to get to the back side of the gate." *Id.* at 453. He acknowledged that he took the Marshals by surprise, and had stated before that "the Marshals were caught flat-footed by his action." *Id.* at 460.

### Ronald Taylor

Taylor arrived in Wichita on August 19 and, like Cooley, attended the Operation Rescue meeting that evening and volunteered to participate in a rescue on August 20. *Id.* at 462. On the morning of August 20, he "receiv[ed] instructions about not letting marshal touch you...." *Id.* at 460. He testified that he chose to walk through the gates of the clinic rather than scale the fence, but acknowledged that he did enter the compound and place himself near the gate on the inside. *Id.* at 463. He stated that he and the other protesters "were there to close the gate." *Id.* at 468.

### Merri Warren Turner

Turner came to Wichita on August 18 and attended the Operation Rescue meeting on the evening of August 19. *Id.* at 471. She

testified that she "had heard about [Judge Kelly's order]" and that she was "not too sure there are many people that haven't." *Id.* at 474. She testified that sometime after noon on August 20, she "moved across the street with a group of people who were going down the right-hand side of the fence . . . and [she] crossed over the fence with some of the men and women who were . . . doing that as an attempt to keep the women from coming in." *Id.* at 475. Once inside the clinic grounds, she "went down the side line of the grass and sat [at] . . . the left-hand edge of gate." *Id.* at 476.

As a result of their actions the defendants were arrested and subsequently charged with, by force or threat, willfully preventing, interfering with, impeding or obstructing the United States Marshals on the scene in the performance of their duties in enforcing the district court's injunction, or attempting to do so.[1] The defendants' cases were consolidated for jury trial before the district judge who issued the injunction. The trial began on November 19, 1991, and concluded with a guilty verdict on November 26, 1992.

Eight weeks prior to trial, defendant Ronald L. Taylor moved that the district judge recuse himself under 28 U.S.C. § 455(a) or (b)(1), on the ground of bias, or that the judge's impartiality might reasonably be questioned. The written motion was accompanied by Taylor's affidavit which alleged, in substance, that:

1. The district judge had appeared on national television with Barbara Walters to talk about the abortion protests in Wichita, and had stated in part that "these people are breaking the law."

2. The district judge had "been quoted in national media saying if anyone plans to come to Wichita, 'they had better bring a toothbrush!'"

3. World magazine, August 24, 1991 edition, stated that the district judge "has

frightened off a few activists with threats of lengthy prison terms."

4. The district judge stated that "he was 'disgusted' with the Justice Department for weighing in on the side of the rescuers by questioning his jurisdiction in the matter."

5. The district judge sentenced one protester to jail, stating in court that the sentence was because of the protester's "blatant defiance" of the injunction issued by the judge prohibiting interference with ingress or egress from the clinics in question.

6. According to Life Advocate magazine, the district judge's cousin and daughter held leadership positions in the National Organization for Women.

7. The judge has received "national attention for his remarks of judicial matters pending before him with regard to civil disobedience in Wichita."

Taylor R.Vol. I, tab 18.

On October 1, 1991, defendant Robert E. Cooley filed a similar motion and affidavit. The only factual assertions of substance which differed from those alleged by Taylor are as follows:

1. The judge was "widely quoted threatening lengthy jail stays for involved parties, including the Standing Governor of Kansas and the local Catholic Bishop."

2. The judge "appeared on the television news program, Nightline, where he made numerous prejudicial remarks including, 'these people are breaking the law.'"

3. On "several occasions" the judge displayed "open hostility and emotions over which he was not fully in control. Even his admirers in the media characterized him with such adjectives as 'firey,' 'feisty,' 'impassioned.'"

4. On August 5, 1991, the judge said in open court "'next, those of these pro-

---

1. The statute under which the defendants were charged, 18 U.S.C. § 1509, provides:

Whoever, by threats or force, willfully prevents, obstructs, impedes, or interferes with, or willfully attempts to prevent, obstruct, impede, or interfere with, the due exercise of rights or the performance of duties under any order,

judgment, or decree of the United States, shall be fined not more than $1,000 or imprisoned not more than one year, or both. No injunction or other civil relief against the conduct made criminal by this section shall be denied on the ground that such conduct is a crime.

testers, rescuers, my view, law violators, who have already been arrested more than once—we have all names on computer....'"

Cooley R. Vol. I, tab 18.

The district court held a hearing on October 21, 1991, to address various pending motions, including the Taylor and Cooley motions to recuse. At the hearing, defendants Gary P. Leber and Charles W. Matson verbally joined those motions. Defendant Merri W. Turner filed a written joinder on November 21, 1991. Turner R. Vol. I, tab 29.

At the October 21, 1991, hearing, the government expressly declined to take a position on the recusal motions. Taylor R.Supp. Vol. I at 18. The defendants essentially reiterated and argued the allegations raised in their motions and affidavits, as described above, with the following additions. Defendant Taylor described remarks that the judge's cousin allegedly made at the 1991 conference of the National Organization for Women. In those remarks, the judge's cousin supposedly referred to the necessity of influencing people who are in a position to "get Operation Rescue out of your town." *Id.* at 21. Taylor also referred to an article in the August 21, 1991, issue of the Wichita Eagle in which the reporter stated: "saying through his clinched [sic] teeth that it is over, U.S. District Judge Patrick Kelly on Tuesday ordered the arrest of several Operation Rescue leaders because they failed to post a hundred thousand dollar bond as he had ordered on August 6. 'I'm telling you, sir, I'm through,' a seething Kelly told Operation Rescue spokesman Pat Mahoney as he stood handcuffed before Kelly in federal court at 3:55 p.m. on Tuesday." *Id.* at 22. In addition, Taylor referred to other printed articles appearing in the August 22, 1991, edition of the Wichita Eagle, quoting the district judge as saying "Days of protests are over." *Id.* at 23. Finally, defendant Taylor referred the judge to comments he had made to Senator Dole at the judge's confirmation hearing many years previously. In those remarks the judge stated that "No

one will ever have reason to accuse me of leaning one way or the other." *Id.* at 24.

After hearing all of the arguments offered by the parties in support of their recusal motions, the court denied the motions, stating that his actions constituted nothing more than a discharge of his duty to carry out and uphold the law, including informing others that lawful orders of the courts must be obeyed. *Id.* at 25–26.[2] The court stated further: (1) that he was in no way biased against the defendants or any other litigants involved in the abortion protests, and that he had treated and would continue to treat all litigants fairly, evenly, and impartially; (2) that he was not privy to any of the factual evidence that pertained to any of the defendants; (3) that the propriety of the injunction which had been issued and statements by leaders of Operation Rescue and statements of the court with respect to those leaders were utterly irrelevant to the specific charges pending against the defendants; (4) that whatever steps the court had previously taken, formally or informally, from the bench or otherwise, to insure compliance with the court's injunction were also irrelevant since there is "nothing about any actions or statements which remotely relate to any of the defendants' guilt or innocence, and I will not be driven from the exercise of my responsibility here because I have somehow displeased some in the exercise of that role and which was done to assure compliance with my directive as I have dealt with Operation Rescue's leaders or its followers." *Id.* at 27–29.

All of the defendants renewed their motions for recusal as part of their motions for a judgment of acquittal at the close of the government's case, Taylor R.Vol. IV at 385, 411, 413, and as part of their respective post-trial motions for judgments of acquittal or, in the alternative, for a new trial. The respective motions were all denied.

In their trial and post-trial motions, the defendants did not in any material way ex-

---

**2.** In his response the district judge referred to "28 U.S.C. § 455 and ... other provisions that address reasons for recusal." Taylor R.Supp. Vol. I at 18. However, in renewals of the motions to recuse at the end of the government's

case and following the jury's verdict, the defendants and the court all referred both to §§ 144 and 455 as if § 144 had been invoked from the outset, as the filing of affidavits (a requirement under § 144) had indicated.

pand the reasons they had previously given in support of their motion for recusal. However, in their post-trial motions, defendants Turner, Matson, and Leber concentrated on two arguments. First they suggested that the court would be inclined to accept the testimony of United States Marshals who were on the premises of the clinic because the court ordered them to be there. In that connection, the defendants suggested that the judge should have been sensitive to the fact that he might be called as a witness regarding the issuance of the order which placed the Marshals on the premises, and which underlay the charge in question.[3] Next, the defendants argued that the judge might have become biased because he had received threats, including information that the Pope had been asked to excommunicate him. The defendants also alluded to prior adverse rulings and statements with respect to other anti-abortion activists.

The court rejected all of those arguments in a written opinion issued on February 18, 1992, 787 F.Supp. 977. In that opinion the court again denied any bias whatsoever with respect to the defendants, including the actual conduct of their trial. To the contrary, the court stated that it had "exercised considerable effort to guarantee the rights of the accused." Taylor R.Vol. I, tab 91 at 15. The court also rejected the propositions that threats or previous orders in the same or related actions constituted grounds for recusal. Finally, the court rejected the defendants' arguments that the possibility ever existed that the judge might be called to testify in the case with respect to his injunction, or that the injunction itself or the presence of the Marshals pursuant to the injunction were in any way relevant to the charges against the defendants. That is, no contention had been raised by any of the defendants that the injunction was not a valid order of the court, or that the order had not been breached in some way, or that the United States Marshals were not properly on the premises of the clinic pursuant to the

order. Accordingly, none of those subjects constituted grounds for recusal.

In their briefs on appeal, the defendants essentially repeat the arguments which they raised below.

## II.

## DISCUSSION

### A. Disqualification.

Title 28 U.S.C. § 455(a) provides:

Any justice, judge or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.

■ This subsection is part of a 1974 amendment to the statute, enacted for the purpose of clarifying and broadening the grounds for judicial disqualification. "The general language of subsection (a) was designed to promote public confidence in the integrity of the judicial process by replacing the subjective ['in the opinion of the judge'] standard with an objective test." *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 858 n. 7, 108 S.Ct. 2194, 2202, n. 7, 100 L.Ed.2d 855 (1988). *See* S.Rep. No. 93–419 at 1 (1973); H.R.Rep. No. 93–1453 at 1–2 (1974), U.S. Code Cong. & Admin. News 1974, p. 6351. The subsection "applies to the varied and unpredictable situations not subject to reasonable legislative definition in which judges must act to protect the very appearance of impartiality." *United States v. Gipson*, 835 F.2d 1323, 1325 (10th Cir. 1988). Under it a judge has a continuing duty to recuse before, during, or, in some circumstances, after a proceeding, if the judge concludes that sufficient factual grounds exist to cause an objective observer reasonably to question the judge's impartiality. *Liljeberg*, 486 U.S. at 861, 108 S.Ct. at 2203; *see also Frates v. Weinshienk*, 882 F.2d 1502, 1505–07 (10th Cir.1989), *cert. denied*, 494 U.S. 1004, 110 S.Ct. 1297, 108 L.Ed.2d 474 (1990); *United States v. Kelly*, 888 F.2d 732, 744 (11th Cir.1989). However,

---

3. The post-trial argument that the judge might have been called as a witness is patently makeweight in view of the fact that no such argument was made by the defendants in their motions to

recuse made before and during trial. It is just this sort of tactical creativity rather than genuine substance that justifies a careful evaluation of motions to recuse.

this court has held that "[a] motion to recuse under section 455(a) must be timely filed." *Willner v. University of Kansas*, 848 F.2d 1023, 1028 (10th Cir.), *cert. denied*, 488 U.S. 1031, 109 S.Ct. 840, 102 L.Ed.2d 972 (1988).

■ In applying § 455(a), the judge's actual state of mind, purity of heart, incorruptibility, or lack of partiality are not the issue. *See, e.g., Hall. v. Small Business Admin.*, 695 F.2d 175, 179 (5th Cir.1983); Susan B. Hoekema, *Comment, Questioning the Impartiality of Judges: Disqualifying Federal District Court Judges Under 28 U.S.C. § 455(a)*, 60 Temp.L.Q. 697, 727 (1987). The test in this circuit is " 'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.' " *United States v. Burger*, 964 F.2d 1065, 1070 (10th Cir.1992) (quoting *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir.1987)), *cert. denied*, —— U.S. ——, 113 S.Ct. 1854, 123 L.Ed.2d 477 (1993); *see also Glass v. Pfeffer*, 849 F.2d 1261, 1267 (10th Cir.1988); *United States v. Gigax*, 605 F.2d 507, 511 (10th Cir.1979). The standard is purely objective. The inquiry is limited to outward manifestations and reasonable inferences drawn therefrom. In applying the test, the initial inquiry is whether a reasonable *factual* basis exists for calling the judge's impartiality into question. *Gipson*, 835 F.2d at 1325; *Willner v. University of Kansas*, 848 F.2d 1023, 1026–27 (10th Cir.1988); *United States v. Hines*, 696 F.2d 722, 729 (10th Cir.1982); *In re Allied Signal, Inc.*, 891 F.2d 967, 970 (1st Cir.1989), *cert. denied*, 495 U.S. 957, 110 S.Ct. 2561, 109 L.Ed.2d 744 (1990).

■ Judicial gloss on the statute by way of various limitations stems from a necessary emphasis on the term "reasonably" in section 455(a). We have stressed that "section 455(a) must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Franks v. Nimmo*, 796 F.2d 1230, 1234 (10th Cir.1986) (quoting *United States v. Hines*, 696 F.2d at 729). The stat-

ute is not intended to give litigants a veto power over sitting judges, or a vehicle for obtaining a judge of their choice. *See, e.g., In re United States*, 666 F.2d 690, 694 (1st Cir.1981); *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir.1986).

Congress expressed concern over abusive invocation of the statute by parties as a means of judge shopping, stating:

> Nothing in this proposed legislation should be read to warrant the transformation of a litigant's fear that a judge may decide a question against him into a "reasonable fear" that the judge will not be impartial. Litigants ought not have to face a judge where there is a reasonable question of impartiality, but they are not entitled to judges of their own choice.

H.Rep. No. 1453, 93d Cong., 2d Sess. 1 (1974), *reprinted in* 1974 U.S.Code Cong. & Admin. News 6351, 6355.

■ Thus, in addition to other factors, this and other courts have identified various matters arising in cases involving §§ 144, 455(a), or 455(b)(1), which will not ordinarily satisfy the requirements for disqualification under § 455(a): (1) Rumor, speculation, beliefs, conclusions, innuendo, suspicion, opinion, and similar non-factual matters, *United States v. Burger*, 964 F.2d at 1069; *Glass v. Pfeffer*, 849 F.2d at 1267; *Willner v. University of Kansas*, 848 F.2d at 1027; *Hinman v. Rogers*, 831 F.2d at 939–40; *United States v. Hines*, 696 F.2d at 719; (2) the mere fact that a judge has previously expressed an opinion on a point of law, *Leaman v. Ohio Dep't of Mental Retardation*, 825 F.2d 946, 949 n. 1 (6th Cir.1987); *United States v. Bray*, 546 F.2d 851, 857 (10th Cir.1976), or has expressed a dedication to upholding the law or a determination to impose severe punishment within the limits of the law upon those found guilty of a particular offense, *United States v. Gigax*, 605 F.2d at 514; *United States v. Haldeman*, 559 F.2d 31, 134 n. 302 (D.C.Cir.1976), *cert. denied*, 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977);[4]

---

4. Judges take an oath to uphold the law; they are expected to disfavor its violation. Thus, generally stated views, even when expressed strongly, against a wide variety of conduct, such as murder, invidious discrimination, rape, drug trafficking, and mayhem, to illustrate the obvious, or in favor of the First Amendment, for example, are not unreasonable for a judge, and

(3) prior rulings in the proceeding, or another proceeding, solely because they were adverse, *see Glass v. Pfeffer,* 849 F.2d 1261, 1268 (1988); *Green v. Dorrell,* 969 F.2d 915, 919 (10th Cir.1992); *Willner v. University of Kansas,* 848 F.2d at 1028; (4) mere familiarity with the defendant(s), or the type of charge, or kind of defense presented, *see Frates v. Weinshienk,* 882 F.2d at 1506; (5) baseless personal attacks on or suits against the judge by a party, *United States v. Bray,* 546 F.2d at 858;[5] (6) reporters' personal opinions or characterizations appearing in the media, media notoriety, and reports in the media purporting to be factual, such as

quotes attributed to the judge or others, but which are in fact false or materially inaccurate or misleading;[6] and (7) threats or other attempts to intimidate the judge. *See United States v. Studley,* 783 F.2d 934, 940 (9th Cir.1985); *United States v. Grismore,* 564 F.2d 929, 934 (10th Cir.1977), *cert. denied,* 435 U.S. 954, 98 S.Ct. 1586, 55 L.Ed.2d 806 (1978). Finally, we have emphasized that "[t]here is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *Hinman,* 831 F.2d at 939.[7]

■ We review the denial of a motion to recuse under § 455(a) for abuse of discretion.

would not, absent more, disqualify a judge from sitting on a case involving the same subject matter. *United States v. Johnson,* 537 F.2d 1170, 1175 (4th Cir.1976) (judge's announced belief that heroin distribution deserved severe punishment did not disqualify him from conducting retrial); *Baskin v. Brown,* 174 F.2d 391, 394 (4th Cir.1949) ("A judge cannot be disqualified merely because he believes in upholding the law, even though he says so with vehemence."); *Phillips v. ANR Freight Sys., Inc.,* 945 F.2d 1054, 1056 (8th Cir.1991) (recusal not required where district court judge voiced strong feelings about Title VII litigation generally), *cert. denied,* —— U.S. ——, 113 S.Ct. 81, 121 L.Ed.2d 45 (1992); *United States v. Bray,* 546 F.2d at 857 ("The mere fact that a judge has previously expressed himself on a particular point of law is not sufficient to show personal bias or prejudice."). *See also* Susan B. Hoekema, *Comment, Questioning the Impartiality of Judges: Disqualifying Federal District Court Judges Under 28 U.S.C. § 455(a),* 60 Temp.L.Q. 697, 703 n. 50 (1987).

5. Although *Bray* involved a § 144 recusal issue, the reasoning there is equally applicable to § 455(a). There we quoted *United States v. Garrison,* 340 F.Supp. 952, 957 (E.D.La.1972), stating: " 'The mere fact that a defendant has made derogatory remarks about a judge is insufficient to convince a sane and reasonable mind that the attacked judge is biased or prejudiced....' " *Bray,* 546 F.2d at 858. The same is true regarding an objective person, knowing all the facts, assessing whether the judge's impartiality may *reasonably* be questioned. Any other conclusion would allow defendants to cause the recusal of judges simply by making scurrilous and disparaging remarks or charges about them. Permitting parties to manipulate the system with falsehoods or insults in such a manner would be a bizarre application of § 455(a) or (b)(1), as well as § 144.

6. "Although public confidence may be as much shaken by publicized inferences of bias that are false as by those that are true, a judge

considering whether to disqualify himself must ignore rumors, innuendoes, and erroneous information published as fact in the newspapers ... To find otherwise would allow an irresponsible, vindictive or self-interested press informant and/or an irresponsible, misinformed or careless reporter to control the choice of judge."
*United States v. Greenough,* 782 F.2d 1556, 1558 (11th Cir.1986) (quoting *In re United States,* 666 F.2d 690, 695 (1st Cir.1981)).
"[T]o the extent the doubts [concerning the judge] were created by representatives of the press shown to be not grounded in fact, they cannot require disqualification." The mere fact that the issue of disqualification of Judge Clemon has drawn the attention of the media, resulting in extensive coverage is not, in itself, a good reason to reassign this case.
*Id.* at 1558–59 (quoting *United States v. State of Alabama,* 582 F.Supp. 1197, 1208 (N.D.Ala. 1984)).

7. In identifying this non-exclusive list of factors which may inform courts in their application of the test under § 455(a), we intentionally omit any reference to the extra-judicial knowledge rule. The problem we focus on in this case is an extra-judicial appearance. The United States Supreme Court has granted review in *United States v. Liteky,* 973 F.2d 910 (11th Cir.1992), *cert. granted,* —— U.S. ——, 113 S.Ct. 2412, 124 L.Ed.2d 636 (1993) (No. 92–6921), in which the question presented is whether, under § 455(a), the cause of apparent bias must stem from an extra-judicial source. The cases in this circuit are arguably inconsistent, sometimes applying such a rule to § 455(b)(1), and sometimes to § 455(a). *See, e.g., Franks v. Nimmo,* 796 F.2d at 1234 (rule applies to § 455(b)(1), but unspecific as to § 455(a)); *United States v. Hines,* 696 F.2d at 728 (same); *United States v. Page,* 828 F.2d 1476, 1481 (10th Cir.) (rule applies to § 455(a) and (b)(1)), *cert. denied,* 484 U.S. 989, 108 S.Ct. 510, 98 L.Ed.2d 508 (1987); *United States v. Bray,* 546 F.2d at 859 (rule applied to § 144).

United States v. Smith, 997 F.2d 674, 681 (10th Cir.1993); United States v. Burger, 964 F.2d 1065, 1070 (10th Cir.1992); Weatherhead v. Globe, 832 F.2d 1226, 1227 (10th Cir.1987). Applying the factors outlined above, we have no difficulty concluding in this case that the district judge did not abuse his discretion by denying the defendants' motions to recuse based on every ground except one: the judge's appearance and statements on the network news program "Nightline." Because of insufficient facts in the record we do not address the effect of other interviews which the judge may have granted the "media" regarding the abortion protests and his order.

■ Except for the one television appearance, the defendants' general allegations of impropriety either state no reasonable basis for recusal, or are so lacking in particularity and substantiation as to fall short of establishing the necessary factual predicate for any meaningful review. The judge's appearance on Nightline is another matter, however. The program and interviewer, Barbara Walters, were identified and the subject was repeatedly brought to the court's attention. The court not only did not deny either the television appearance or its subject matter—the abortion protests taking place at Wichita clinics, including the Tiller clinic—it tacitly acknowledged the point. Memorandum Order filed Oct. 22, 1991, Cooley R.Vol. I, Tab 27 at 4; Motions Hearing, Oct. 21, 1991, Taylor R.Supp. Vol. I, Tab 72 at 26, 29. In its comments at one point, the court acknowledged seeing to it, both in and out of court, that "these people whose purpose it is to close these clinics by illegal means ... understood fairly so, firmly so, that this order [the court's injunction prohibiting obstruction of access to the clinics] would be honored." Id. at 26. See also Hearing on Motions for New Trial, Cooley R.Supp.Vol. V, Tab 76 at 613–14.

The court made no analysis under § 455(a) of its television appearance except to state that the only relevant consideration was the specific charge against these defendants, and that the court knew nothing about the facts of their cases, and had no predisposition as to their guilt or innocence of the charges. But § 455(a) asks a broader question which, on these facts, makes it impossible to take these cases out of context. The protests and tactics of the protesters at the Wichita clinics, and the court's order forbidding obstruction of ingress and egress, are subjects and events with which these cases are inextricably intertwined.

Two messages were conveyed by the judge's appearance on national television in the midst of these events. One message consisted of the words actually spoken regarding the protesters' apparent plan to bar access to the clinics, and the judge's resolve to see his order prohibiting such actions enforced. The other was the judge's expressive conduct in deliberately making the choice to appear in such a forum at a sensitive time to deliver strong views on matters which were likely to be ongoing before him. Together, these messages unmistakenly conveyed an uncommon interest and degree of personal involvement in the subject matter. It was an unusual thing for a judge to do, and it unavoidably created the appearance that the judge had become an active participant in bringing law and order to bear on the protesters, rather than remaining as a detached adjudicator.[8]

We conclude that at least after the judge's volunteer appearance on national television to state his views regarding the ongoing protests, the protesters, and his determination that his injunction was going to be obeyed, a reasonable person would harbor a justified doubt as to his impartiality in the case involving these defendants. Accordingly, we hold that the district judge abused his discretion when he denied the defendants' motions under § 455(a) to disqualify himself from sitting on these cases.

■ Because of this holding it is unnecessary for us to address the allegations under § 144 or § 455(b)(1) of actual bias against

---

8. Canon 3A.(6) of the Code of Conduct for United States Judges provides that "[a] judge should abstain from public comment about a pending or impending proceeding in any court...." We express no opinion as to whether this Canon was breached by the district judge's remarks on television or to the press. But the goal sought to be served by the Canon informs our analysis.

the defendants.[9] We do note, however, that the record of the proceedings below, including the sentences imposed, discloses no bias. To the contrary, it appears that the district judge was courteous to the defendants and sedulously protected their rights.

### B. Sufficiency of the Evidence/Jury Instructions.

■ Pursuant to this court's decisions in *United States v. Perez*, 959 F.2d 164, 168 (10th Cir.1992); *United States v. Haddock*, 961 F.2d 933, 934 (10th Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 88, 121 L.Ed.2d 50 (1992) (and cases cited therein); *United States v. Jelsma*, 630 F.2d 778 (10th Cir.1980); and *United States v. Morris*, 612 F.2d 483, 491–92 (10th Cir.1979), we must also address the defendants' contentions that the evidence was insufficient to support their respective convictions. There is no dispute that under a charge of violating 18 U.S.C. § 1509, the government was required to prove beyond a reasonable doubt that each defendant: (1) by threat or force, (2) willfully, (3) did or attempted to prevent, obstruct, impede, or interfere with the performance of duties of the United States Marshals, (4) acting under court order. The standard we employ is whether a rational trier of fact could have found these elements beyond a reasonable doubt, viewing the evidence in the light most favorable to the government. *United States v. Tranakos*, 911 F.2d 1422, 1430 (10th Cir.1990); *United States v. Hooks*, 780 F.2d 1526, 1531 (10th Cir.), *cert. denied*, 475 U.S. 1128, 106 S.Ct. 1657, 90 L.Ed.2d 199 (1986).

The evidence in this case, outlined at the beginning of this opinion, overwhelmingly establishes the guilt of each of these defendants with respect to the crime charged.

Each defendant acknowledged willfully entering onto the grounds of the Tiller clinic for the express purpose of blocking or interfering with access to the clinics from inside the entrances, or attempting to do so. The evidence also showed that each defendant acted in furtherance of that purpose. A rational trier of fact could have found beyond a reasonable doubt that in doing so, they intentionally prevented, interfered with, impeded or obstructed, or attempted to prevent, interfere, impede or obstruct the Marshals in the performance of their duties under court order with respect to maintaining free ingress and egress through those entrances. The evidence also abundantly established that each of these defendants in fact did or attempted to accomplish such prevention, obstruction, interference or impeding through force or threat. The Marshals so testified, and the jury could reasonably arrive at a verdict on the point beyond a reasonable doubt.

The defendants contend that the abundant evidence establishing the necessary elements still could not be sufficient because the court permitted the jury to apply the evidence to an erroneous legal theory. Specifically, the defendants argue that the court permitted "imputation of personal guilt from the [actions of the] group," Brief for the Appellants Leber, et al., at 12, and gave what amounted to an "incomplete supplemental 'aiding and abetting' instruction," *id.* at 16, when the court answered "yes" to the following question submitted by the jury during its deliberations:

> May the jurors consider the cumulative *effect* of 40 individuals performing an action in determining the guilt or innocence of *each* defendant who acted as one of the defendants?

9. Although § 455(a) is waivable and, therefore, not jurisdictional in nature, *Gipson*, 835 F.2d at 1324–25, we hold that the statute does involve substantial rights of the parties, as well as the public at large; therefore, a district judge's refusal to disqualify under § 455(a) may be challenged on direct appeal following conviction as well as by use of mandamus. *See In re School Asbestos Litig.*, 977 F.2d 764, 777–78 (3d Cir. 1992) (allowing post-judgment as well as mandamus challenges to judge's refusal to disqualify himself). *Compare Durhan v. Neopolitan*, 875

F.2d 91, 96–96 (7th Cir.1989) and *United States v. Balistrieri*, 779 F.2d 1191, 1204–05 (7th Cir. 1985) (holding that refusals to disqualify under § 455(a) must be challenged on mandamus and may not be raised post-trial), *cert. denied*, 475 U.S. 1095, 106 S.Ct. 1490, 89 L.Ed.2d 892 (1986) with *In re City of Detroit*, 828 F.2d 1160, 1165–67 (6th Cir.1987) (requiring that challenges to a district judge's refusal to disqualify under § 455(a) be brought up on direct appeal following final judgment, and may not be brought up by way of a petition for writ of mandamus).

Leber R.Supp. Vol. IV at 564 (emphasis added).

On review of a challenge to jury instructions, we consider the instructions as a whole, and presume that the jurors will follow those instructions. *See Hall v. Western Prod. Co.*, 988 F.2d 1050, 1058 (10th Cir. 1993); *United States v. Toledo*, 985 F.2d 1462, 1465 (10th Cir.1993).

We agree with the district court's analysis of the defendants' contention, set forth in the court's post trial "Memorandum and Order," dated February 18, 1992. Taylor R.Vol. I, Tab 91 at 11–14. As the district court stated, the jury was fully instructed that the guilt of each defendant must be determined individually. Instruction No. 8 provided:

> Although there are multiple defendants in this action, it does not follow from that fact alone that if one is liable, all are liable. Each defendant is entitled to a fair consideration of his own defense and is not to be prejudiced by the fact, if it should become a fact, that you find against the other. Unless otherwise stated, all instructions given you govern the case as to each defendant.

This requirement that guilt or innocence be determined individually was repeated throughout the instructions. Thus, Instruction No. 10, setting forth the basic elements of the crime, required that the jury must find each element beyond a reasonable doubt "as to each defendant." And, in Instruction No. 16, the jury was told:

> [Y]ou are here to determine the guilt or innocence of the accused from the evidence in this case. Defendant is not on trial for any act or conduct not alleged in this case. Neither are you called upon to return a verdict as to the guilt or innocence of any other person or persons not on trial as a defendant in this case.

*See id.* at 13.

The defendants' arguments misconceive the nature of the legal principles involved. The jury's question and the court's affirmative answer went only to the familiar principle of concurrent causation: "causes acting contemporaneously and together causing injury, which would not have resulted in absence of either." *Black's Law Dictionary* 263 (5th ed.1979). That is, the individual acts, taken together, are a "but for" cause, but each actor is liable for his or her own intentional conduct. *See Model Penal Code* § 2.03 (Official Draft and Revised Comments 1985); *see, e.g.,* Wayne R. LaFave and Austin W. Scott, Jr., *Criminal Law* § 35, at 246–50 (1972); Rollin M. Perkins and Ronald N. Boyce, *Criminal Law* 782–85 (3d ed.1982).

The concept of contributory causes is separate from forms of imputed culpability. It does not implicate imputed criminal responsibility; it addresses causation. It describes an amalgam of individual acts where each individual acts with the required culpable mental state but not necessarily to aid another. The *actus reus* is the physical act of the individual, not a third person. Where the result is a prohibited end under law and other contributory causes combine to bring about the prohibited result, it is sufficient to impose culpability on the actor without the need for any concept of conspiracy or aiding and abetting.

Aiding and abetting is another, but nonexclusive, tool for allocating culpability in appropriate circumstances. In theory it is a special form of conduct different from a primary actor who must also be involved. The aider must have the *mens rea* to bring about the result committed by the other principals.

The government is entitled to pursue its own theory of criminal responsibility, of course, and is not required to use or be subjected to standards under another theory even though available. When the jury in this case asked whether they could consider the *effect,* or result, of the combined individual acts of the participants when evaluating the criminal liability of each defendant, the court properly answered "yes." The critical question is whether the jury found individual guilt on the basis of individual conduct. The instructions were clear on that point, and the jury's question did not reflect any misunderstanding.

We have carefully reviewed the instructions to the jury, the jury's questions, and the court's response, and we are satisfied

that no reversible error occurred. The jury was not misled or improperly instructed, and there was ample evidence to support the jury's guilty verdict as to each defendant.

### C. *Other Issues.*

The defendants also raise issues with respect to the propriety of the indictment, the failure to give a requested jury instruction, and an alleged violation of Fed.R.Crim.P. 30 when the court responded to the jury's inquiry regarding the actions of the other protesters who climbed the fence. We find no merit in any of those issues. The defendants' final issue, relating to the propriety of their sentencing, need not be addressed due to our disposition of this case.

## III.

## REMEDY

■ The task of fashioning a remedy for a violation of § 455(a) has been delegated by Congress to the judiciary. *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. at 862, 108 S.Ct. at 2203–04. As the Supreme Court stated in *Liljeberg,* "[w]e must continuously bear in mind that 'to perform its high function in the best way' "justice must satisfy the appearance of justice." ' " *Liljeberg,* 486 U.S. at 864, 108 S.Ct. at 2205 (quoting *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942 (1955) (citation omitted)). To best serve that goal, we are satisfied that the remedy in this case is to vacate the conviction and sentence of each of the defendants in these cases, and remand the cases to the district court for a new trial before a different judge. *See O'Rourke v. City of Norman,* 875 F.2d 1465, 1475 (10th Cir.1989).

## IV.

## CONCLUSION

For the reasons stated above, the convictions in these cases are VACATED, and the cases are REMANDED to the district court for reassignment and a new trial.