F I L E D
United States Court of Appeals
Tenth Circuit

DEC 10 1997

PATRICK FISHER
Clerk

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

  Plaintiff-Appellee,

v.

DENNIS HATATLEY,

  Defendant-Appellant.

No. 96-4170

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 95CR-252S)

---

Scott M. Matheson, Jr., United States Attorney  (David J. Schwendiman, First Assistant United States Attorney with him on the brief), Salt Lake City, Utah, for Plaintiff-Appellee.

Deirdre A. Gorman of Farr, Kaufman, Sullivan, Gorman, Jensen, Medsker & Perkins, Ogden, Utah, for Defendant-Appellant.

---

Before BALDOCK, McWILLIAMS, and EBEL, Circuit Judges.

---

BALDOCK, Circuit Judge.

---

Defendant Dennis Hatatley seeks reversal of a jury verdict finding him guilty of voluntary manslaughter.  On appeal, Defendant argues the district court: 1) improperly

denied his request for an involuntary manslaughter instruction; 2) violated his right to due process by allowing the government to remove the phrase "aiding and abetting" from the indictment prior to submitting the case to the jury; 3) committed plain error by not submitting a jury instruction on aiding and abetting; 4) improperly allowed the government to argue aiding and abetting by tendering an instruction regarding causation to the jury; and 5) improperly implied that he had a duty to safeguard the victim by tendering an instruction regarding duty to safeguard to the jury. Our jurisdiction arises under 28 U.S.C. § 1291. We affirm.

## I.

On Friday, December 15, 1995, Defendant and Curtis Benally, both enrolled members of the Navajo tribe, spent the afternoon drinking and driving near Cortez and Telluride, Colorado. Later that day, Defendant and Benally drove to Montezuma Creek, Utah, where they stayed until dark. Prior to leaving Montezuma Creek, Defendant and Benally bought two six-packs of beer. The two men then left Montezuma Creek and drove Southwest in search of Hyrum Maryboy. A short time later, Defendant and Benally arrived at a compound consisting of a white home where Maryboy lived, a shade house and a hogan[1] occupied by Billy Shorty. Benally knocked on Maryboy's door. Maryboy's mother, Bessie Keith, told Benally that he was not home. The two men then approached the hogan. Meanwhile, the victim, Kee Smith, arrived on the scene with Curtis Benally's

---

[1] A "hogan" is a traditional Navajo dwelling.

sister, Marie Tsosie. Smith and Tsosie had been drinking on the way to Shorty's, and Smith was heavily intoxicated. Smith continued to drink after arriving outside Shorty's hogan.

Shortly after Smith arrived outside Shorty's hogan, Defendant was sitting in Benally's car drinking when Smith became belligerent and pulled him out of the car. Defendant and Smith began to fight. At one point, Defendant was on the ground being kicked by Smith. The tables turned, however, when Benally entered the fray on Defendant's behalf. The record reveals that at this point, Smith was on the ground attempting to block kicks directed toward him by both Defendant and Benally. The entire fight outside Shorty's hogan between Defendant, Benally and Smith apparently lasted no longer than five minutes and resulted in only minor injuries to Defendant and Smith.[2] (See Tr. Rec. Aug. 12 at 782). Indeed, the record suggests that after the fight broke up, the three men made some sort of amends and continued drinking together. (Tr. Rec. Aug. 13 at 954).

Sometime after the fight, Defendant and Benally forced Smith into Benally's car and left the scene.[3] Marie Tsosie followed the three men in Smith's pickup. Fearful that

---

[2] When asked about Defendant and Smith's injuries, Marie Tsosie testified that she noticed that Smith had a bloody mouth and Defendant had a bloody nose. She testified that Defendant and Smith had no other visible injuries.

[3] The testimony on this point varies. Marie Tsosie testified that Smith "went in the car." However, other testimony indicates that Defendant and Benally forced a struggling Smith into the car. Benally, in a report given to an FBI Agent claims that Defendant alone pulled Smith into the car by his hair.

3

the pickup would get stuck in the sandy soil, Tsosie passed Benally's vehicle in order to gain more speed. Benally then stopped the car and the three men got out. At this point, Tsosie was some distance ahead of the three men and did not observe what happened once Benally's car stopped. Although Defendant and Benally disagree on what happened next, Smith was clearly ejected from the vehicle and left drunk and beaten in the freezing desert. The record also suggests that Defendant and Benally resumed beating Smith after he exited the vehicle.[4]

Around noon on Saturday, December 16, 1995, Rose and Frank Harrison found the victim's body, frozen and covered with sand, in the bottom of the desert wash. The Harrison's immediately notified several emergency medical technicians (EMT's) who were training in Montezuma Creek. The EMT's responded to the scene to determine whether the victim was living, and notified law enforcement agencies. Shortly thereafter and throughout the day, officers from the San Juan County Sheriff's Department, the Navajo Department of Public Safety, and the Federal Bureau of Investigation secured and investigated the site where the body was found. Officials transported the victim's body to the Utah State Medical Examiner and an autopsy followed.

---

[4] Defendant and Benally were apparently the only people present when Smith was ejected from Benally's car. Not surprisingly, Benally says that Defendant pulled Smith out of the car and began beating Smith. Equally predictable, Defendant blames Benally for ejecting Smith from the vehicle and abandoning him. Regardless, the record suggests that both Defendant and Benally participated in the event.

The Government charged Defendant with second degree murder and as an aider and abettor for the death of Kee Smith pursuant to 18 U.S.C. § 2, § 1111, and § 1153(a). At trial, the government introduced expert testimony by Dr. Todd Grey that Smith died from multiple blunt force injuries to the head and body. Dr. Grey opined that Smith's beating resulted in a lacerated liver and subdural hematoma that ultimately caused his death. The defense produced two experts who reviewed Dr. Grey's findings and reached different conclusions. Dr. Robert Rothfeder, an attorney and part-time emergency room physician, acknowledged the injuries noted by Dr. Grey but did not feel they caused Smith's death. Instead, Dr. Rothfeder opined that the cause of death was hypothermia. Dr. Heinz Karnitschnig, a retired pathologist, also testified on behalf of Defendant. Dr. Karnitschnig agreed with Dr. Rothfeder that the injuries inflicted by the beating were not severe enough to cause death. He further agreed that the cause of death was hypothermia. All three doctors agreed, however, that the subdural hematoma and lacerated liver were serious and possibly fatal injuries.

Prior to submission to the jury, the government dropped the statutory aiding and abetting charge against Defendant, leaving the jury to consider only whether he was a principal. Defendant proffered a jury instruction for involuntary manslaughter. The district court decided the evidence did not support the instruction and refused to submit it to the jury. However, the district court did submit an instruction on the lesser included

5

offense of voluntary manslaughter. The jury returned a verdict finding Defendant guilty of voluntary manslaughter. The district court sentenced him to 46 months in prison.

## II.

## A.

Defendant's first argument on appeal is that the district court abused its discretion by refusing to instruct the jury on involuntary manslaughter. More specifically, Defendant argues that the evidence presented at trial and this Court's prior decisions supported the instruction and mandate reversal. We disagree.

A criminal defendant is "always entitled to an instruction giving his theory of defense if supported by the evidence." United States v. Moore, 108 F.3d 270, 273 (10th Cir. 1997). "The decision of whether there is enough evidence to justify a lesser included offense charge rests within the sound discretion of the trial judge." United States v. Chapman, 615 F.2d 1294, 1298 (10th Cir. 1980). The trial judge does not abuse his discretion by refusing to instruct on a lesser included offense when the evidence before him provides no rational basis upon which the jury could find the defendant guilty of the lesser offense. Id. at 1299.

Involuntary manslaughter is defined as "the unlawful killing of a human being without malice . . . [i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution or circumspection, of a lawful act which might produce death." United States v. Pino, 606 F.2d 908, 916 n. 10

6

(10th Cir. 1979). Defendant argues that because the victim was the initial aggressor, any injuries he inflicted upon the victim were done so in self-defense. Thus, Defendant suggests that his actions against the victim were lawful acts committed in an unlawful manner which support an instruction on involuntary manslaughter.

In so arguing, Defendant attempts to sever his involvement with the victim after the initial fight at Billy Shorty's home. The record, however, indicates that Defendant's actions toward the victim continued beyond the initial confrontation. The evidence showed that after Defendant and the victim fought the first time, Defendant and Benally dragged the victim against his will into Benally's car. The evidence also suggests that Defendant and the victim had another altercation in the car, that Defendant and Benally forcibly removed the victim from the car, further beat him, and left him badly beaten and shirtless in a freezing, remote desert wash.[5] Thus, even assuming Defendant's actions toward the victim during their initial confrontation were lawful, he clearly entered the realm of unlawfulness when he and Benally forced the victim into Benally's car, drove him away, resumed beating him and abandoned him in the wash.

---

[5] Throughout his brief, Defendant insists that the desert wash is a frequently traveled "thoroughfare" where Defendant and Benally could have reasonably expected a passerby to pick up the victim and carry him to safety. Defendant's description is, at best, a stretch. While the record contains testimony describing the wash as a local "thoroughfare," an objective reading suggests the area is remote and not frequently traveled.

In the alternative, Defendant argues that even if he did unlawfully assault the victim, that assault is not a felony. Thus, Defendant contends he was entitled to an involuntary manslaughter instruction because the victim died as the result of Defendant committing an unlawful act not amounting to a felony. To the contrary, the record demonstrates that Defendant's actions against the victim were felonious.

Defendant correctly notes that simple assault is not a felony. However, Defendant's conduct constituted aggravated assault, which is a felony. United States v. Tissnolthtos, 115 F.3d 759, 763 (10th Cir. 1997) (aggravated assault, a felony, is an assault resulting in serious bodily injury). The record reveals that Defendant and Benally repeatedly kicked and hit the victim. The victim's blood was found on both Defendant and Benally's shoes. Samples taken from Benally's car contained forcibly removed hair belonging to the victim. Furthermore, Defendant's participation helped cause the victim to suffer numerous abrasions and lesions, a possibly fatal subdural hematoma and a possibly fatal lacerated liver. These injuries constitute serious bodily injury. See United States v. Dennison, 937 F.2d 559, 562 (10th Cir. 1991).

The decision of whether the evidence supported an involuntary manslaughter instruction belonged to the district court. The district court found that the evidence did not support the instruction. After a thorough review of the record, we conclude that based on the evidence produced at trial, no rational jury could have found Defendant guilty of involuntary manslaughter and acquitted on the greater offenses of second degree murder

8

and voluntary manslaughter. Thus, the district court did not abuse its discretion by refusing to instruct the jury on involuntary manslaughter.

Defendant's second argument on appeal is that the district court erred when it struck the government's aiding and abetting charge from the indictment. Specifically, Defendant claims the court's action violated his due process rights by depriving him of the opportunity to present an intoxication defense to the jury on the aiding and abetting charge. Defendant's argument is without merit.

The government charged Defendant with second degree murder and also as an aider and abetter. At trial, Defendant intended to present expert testimony that he was too intoxicated to formulate the specific intent needed to be an aider and abetter. The government asked the district court to strike the aiding and abetting charge and chose to proceed solely on the theory that Defendant was a principal. Accordingly, the district court struck the aiding and abetting charge from the indictment.

Defendant now contends that his due process rights were violated because the government dropped the aiding and abetting charges against him and only prosecuted him as a principal. In support, Defendant argues that this was obviously an improper tactic by the government to keep Defendant's expert from testifying that he could not form the specific intent to be an aider and abetter. Regardless of the government's reason for dropping the charge, Defendant certainly has no due process right to be tried as an aider

9

and abetter. See United States v. Cooley, 1 F.3d 985, 997 (10th Cir. 1993) ("The government is entitled to pursue its own theory of criminal responsibility . . . and is not required to use or be subjected to standards under another theory even though available."). Furthermore, once the government dropped the aiding and abetting charges, there was no need for the expert to testify. At that point, the government was proceeding against Defendant as a principal on theories of second degree murder and voluntary manslaughter. Indeed, expert testimony on intoxication would be irrelevant, if not entirely improper, in relation to general intent crimes such as second degree murder and voluntary manslaughter where intoxication is no defense. See United States v. Sands, 968 F.2d 1058, 1064 (10th Cir. 1992) (voluntary intoxication no defense to general intent crime).

## C.

Defendant's next ground for reversal is that the district court erred by not instructing the jury on aiding and abetting after the aiding and abetting charge was struck from the indictment. The thrust of this argument seems to be that because the evidence presented to the jury suggested Defendant was only an aider and abettor and not a principal, the district court should have instructed the jury on aiding and abetting. We disagree.

Defendant did not object when the district court failed to instruct the jury on aiding and abetting and did not offer a final instruction on the theory. Accordingly, we review

for plain error. Fed. R. Crim. P. 52(b). For Defendant to prevail on his plain error argument, he must "show clear or obvious error that affected his substantial rights, and that seriously affected the integrity of the judicial proceedings." United States v. Jones, 80 F.3d 436, 438 (10th Cir. 1996). After the district court struck the aiding and abetting charge, the government was bound to pursue a verdict against Defendant as a principal. Undoubtedly, Defendant could properly argue to the jury that the government failed to prove he was liable as a principal for Smith's death. However, once the aiding and abetting charge was dropped, Defendant had no right to have the jury instructed on a crime with which he was no longer charged. The district court committed no plain error when it refused to tender an instruction on aiding and abetting.

## D.

Defendant's fourth point of error is that by improperly tendering instruction number 28 to the jury, the district court allowed the government to argue aiding and abetting, while the defense was prevented from defending against the theory.[6] Instruction number 28 reads as follows:

> In your consideration of the Government's burden to prove that the Defendant's conduct caused Kee Smith's death, you are instructed as follows:

---

[6] Defendant also argues that instruction number 28 incorrectly states the law pertaining to aiding and abetting. Because we conclude instruction number 28 does not involve aiding and abetting, we need not address this contention.

11

When the conduct of two or more persons contributes concurrently as proximate causes of death, the conduct of each person is a proximate cause regardless of the extent to which each contributes to the death.

Defendant argues that the words "concurrently" and "conduct of each person" essentially allowed the government to argue that he was an aider and abetter in addition to arguing that he was a principal. We disagree.

When reviewing a challenge to jury instructions, we consider the instructions as a whole and presume the jury followed those instructions. Cooley, 1 F.3d at 997. Defendant contends that instruction number 28 allowed the government to argue aiding and abetting to the jury. Defendant misconceives the nature of the legal principles involved. As we explained in Cooley, contributory causation and aiding and abetting are two different principles. Contributory causation addresses the situation where more than one person's actions contribute to an unlawful result. In such a situation, each individual's act is sufficient to render him culpable as a principal for the harm caused. Aiding and abetting, on the other hand, addresses the situation where one person commits the unlawful act, and a second person intentionally assists him in reaching his unlawful goal. The second person, however, did not actually commit the final physical act causing the harm. Instead, with the intent to help the principal reach his ultimate goal, the aider and abetter assists by engaging in a different act which aids or assists the principal. Thus, aiding and abetting allows a jury to hold the aider and abetter responsible to the same extent as the principal, even though his act was not the ultimate cause of the harm.

12

Instruction number 28 addresses contributory causation. After dropping the aiding and abetting charges, the government advanced the theory that Defendant was liable as a principal for the murder of the victim. Therefore, the jury had to find that Defendant's actions proximately caused the victim's demise. The district court's instruction properly charged the jury with finding that Defendant himself performed the acts necessary to be liable as a principal and did not allow the jury to convict him as an aider and abetter. Accordingly, the district court committed no reversible error by submitting instruction number 28 to the jury.

E.

Defendant's final argument is that by tendering instruction number 27 to the jury, the district court improperly implied that he had a duty to safeguard the victim "when in fact he did not." Instruction number 27 reads as follows:

> In your consideration of the government's burden to prove that the defendant's conduct caused Kee Smith's death, you are instructed as follows:
>
> If the defendant's conduct placed Kee Smith in a position of danger, and the defendant failed to safeguard Kee Smith, the defendant's conduct should be regarded as having caused the death of Kee Smith.

The general thrust of Defendant's attack on this instruction is that Benally is the person who harmed the victim and because he did not act in concert with Benally, Defendant had no duty to safeguard the victim. We disagree.

13

When a person puts another in a position of danger, he creates for himself a duty to safeguard or rescue the person from that danger. See Wayne R. Lafave & Austin W. Scott, Jr., Criminal Law § 3.12, at n.84 (2d. ed. 1986). Thus, when a person places another in danger, fails to safeguard or rescue him and he dies, such omission is sufficient to support criminal liability. See Id.

The record does not support Defendant's position. The record is replete with evidence tending to show Defendant played a part in ejecting the victim from Benally's car[7], that Defendant persisted along with Benally in further beating and kicking the victim and that Defendant made no attempt to keep the victim from being left beaten and shirtless in the freezing desert wash. After placing the victim in danger, Defendant had a duty to rescue him from that danger. Defendant made no attempt to comply with this duty. We have carefully reviewed and considered the instructions as a whole and conclude that the district court did not err in submitting instruction number 27 to the jury.

For the foregoing reasons, the district court's judgment is

AFFIRMED.

---

[7] Indeed, in a statement given to the FBI, Defendant admitted that "we threw that guy off right there."

14

96-4170, <u>United States v. Hatatley</u>

**EBEL, Circuit Judge, dissenting**

As noted by the majority, a trial court does not abuse its discretion when it denies an instruction as to a lesser included offense when there is no evidence upon which a reasonable jury could find the defendant guilty of that lesser offense. <u>See</u> <u>United States v. Chapman</u>, 615 F.2d 1294, 1298 (10th Cir. 1980). What's more, "[o]nly when an appellate court is convinced that the evidence issues are such that a rational jury could *acquit* on the charged crime but *convict* on the lesser crime may the denial of a lesser included offense charge be reversed." <u>U.S. v. Moore</u>, 108 F.3d 270, 272 (10th Cir. 1997) (citing <u>Keeble v. United States</u>, 412 U.S. 205 (1973)) (emphasis in original). In reviewing the denial of a jury instruction, "we must give full credence to [the] defendant's testimony." <u>United States v. Smith</u>, 63 F.3d 956, 965 (10th Cir. 1995). Because my review of the record reveals evidence upon which a reasonable jury could have found Defendant Hatatley guilty of the lesser included offense of involuntary manslaughter, yet not guilty of the offense of voluntary manslaughter, I conclude that the district court erred in refusing to give an instruction on involuntary manslaughter to the jury.

I first emphasize that in this case the Government explicitly chose not to charge Defendant with aiding and abetting in the killing of Kee Smith. In making this tactical move the Government undertook to hold Defendant accountable only for his own actions

and accepted the burden of proving beyond a reasonable doubt not only that Defendant's actions caused the death of Kee Smith, but also that those causative actions meet the statutory requirements of voluntary manslaughter.

In order for the jury to find Defendant guilty of involuntary manslaughter, but not voluntary manslaughter, the evidence would have to be such that it would have been possible for the jury reasonably to conclude that Defendant killed Smith by "the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection, of a lawful act which might produce death." 18 U.S.C. § 1112(a) (1984). Based upon this record, there is at least one way in which the jury could have made such a determination.

On the evidentiary record before it, the jury could have found that Defendant caused Smith's death while performing a lawful act, namely self-defense, in an unlawful manner. A killing done in self-defense but by use of excessive force qualifies as involuntary manslaughter. See United States v. Begay, 833 F.2d 900, 901-03 (10th Cir. 1987) (holding that where evidence is present that killing was done in self-defense but force used was criminally negligent, instruction on involuntary manslaughter is proper). The majority admits that Smith's beating of Defendant at the hogan could have been lawful, in that it was arguably done in self-defense. The majority goes on to say that *even assuming* the lawfulness of Defendant's actions in front of the hogan, because the evidence shows that Defendant further beat Smith in the car and in the wash, he "clearly

2

entered the realm of unlawfulness." This statement ignores the possibility that the jury could have found (a) Defendant's lawful act in front of the hogan (self-defense), performed in an unlawful manner (excessive force amounting to criminal negligence), caused all of the serious bodily injury that lead to Smith's death and (b) Defendant's subsequent unlawful assault of Smith in the car and in the wash either did not cause Smith's death or did not cause serious bodily injury to Smith and thus did not rise to the level of felonious assault.

The record strongly suggests that it was Smith who initiated the fight with Defendant at the hogan. Witness Marie Tsosie testified that Smith was looking for a fight and that Smith hit Defendant first. (See Tr. Rec. Aug. 12 at 779, 795-96.) Defendant told officials that someone jerked him out of a car and began hitting him, at which point Defendant began to fight back. (See Tr. Rec. Aug. 13 at 890.) Defendant also told officials that he kicked Smith out of anger because Smith had hit him first. (See Tr. Rec. at 901.) Until Benally entered the fray, the record suggests that Defendant was in the process of receiving a severe beating from Smith. (See id. at 961-62.) Thus, the jury could reasonably have found that the blows Defendant administered to Smith during that altercation were undertaken in self-defense, albeit with unlawfully excessive force.

The majority asserts that the fight outside the hogan resulted in only minor injuries to the Defendant. However, that views the evidence most favorable to the Government. When evaluating whether a lesser included charge should be submitted to the jury, we

3

have to ask whether there was evidence upon which that charge could be predicated. Here, there certainly was evidence upon which a jury could conclude that the fatal injuries were administered at the hogan during the stomping of Defendant. Indeed, his fatal injuries were internal and not inconsistent even with Marie Tsosie's testimony.

The record is not clear as to the severity of the blows, if any, delivered by Defendant to Smith in the car and in the wash. Hair that had been yanked from Smith's head was found in Benally's car, but the record is not clear whether Benally or Defendant was responsible for that. (See Tr. Rec. Aug. 9 at 543.) Benally and Defendant told investigators that there was some fighting between Smith and Defendant both in the car and in the wash, but the record is equivocal as to the severity of the fighting and the relative degrees of Benally's and Defendant's participation in that fighting. (See Tr. Rec. Aug. 13 at 900, 972.) Even though Defendant's lawful act of self-defense may have terminated at the point when he and Benally placed Smith in Benally's car, the jury could easily have found on this record that all of the serious bodily injury leading to Smith's ultimate death had been done to Smith at the hogan and that none of the blows applied to Smith's person after that were of a nature to result in serious bodily injury or to cause Smith's death. In short, the jury could have found that after Smith's beating at the hogan his demise was a foregone conclusion, and that nothing that happened afterward affected or accelerated Smith's fate -- e.g. that Smith received the ruptured liver and head hematoma injuries during the fight at the hogan and that those injuries caused his death.

4

In this way the jury could have found that Defendant caused Smith's death during the performance of the lawful act of self-defense done with unlawfully excessive force. Thus, I conclude that Defendant was entitled to an involuntary manslaughter instruction.

For the above reasons, I conclude that it was reversible error for the district court to deny Defendant's requested jury instruction on involuntary manslaughter. Accordingly, I respectfully DISSENT.