**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**April 18, 2025**

**FOR THE TENTH CIRCUIT**

**Christopher M. Wolpert**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

No. 23-7057

EARLY WILLARD WOODMORE, III,
a/k/a Earley Willard Woodmore,

    Defendant - Appellant.

_____

**Appeal from the United States District Court**
**for the Eastern District of Oklahoma**
**(D.C. No. 6:20-CR-00004-JFH-2)**

_____

Gail K. Johnson, Johnson & Klein, PLLC, Boulder, Colorado, for Defendant-Appellant.

James R.W. Braun, Special Assistant U.S. Attorney (Christopher J. Wilson, United States Attorney, with him on the brief), Office of the United States Attorney for the Eastern District of Oklahoma, Muskogee, Oklahoma, for Plaintiff-Appellee.

_____

Before **HOLMES**, Chief Judge, **SEYMOUR**, and **EBEL**, Circuit Judges.

_____

**HOLMES**, Chief Judge.

_____

This case presents the second installment in the saga of the Woodmore

brothers—Early and Calvin Woodmore—and their drug-trafficking ring (the

"Woodmore organization") that operated throughout eastern Oklahoma. The

Woodmore brothers proceeded to trial jointly in April 2022 and were both convicted for their role in the Woodmore organization's methamphetamine-distribution enterprise. In January 2025, we affirmed the district court's judgment in the appeal of Calvin Woodmore ("Calvin") related to his involvement in the Woodmore organization. *See United States v. Calvin Woodmore*, 127 F.4th 193 (10th Cir. 2025).[1] We now turn to the appeal of Defendant-Appellant Early Woodmore ("Mr. Woodmore"). On appeal, Mr. Woodmore raises some of the same challenges as Calvin. Like Calvin, Mr. Woodmore argues that the district court erred by failing to properly instruct the jury in two separate ways—*viz.*, first, by delivering an instruction involving the right of attorneys to interview witnesses prior to trial, and second, by failing to provide a definitional instruction for the term "methamphetamine (actual)." Separately, Mr. Woodmore contends that the district court's resolution of an apparent custody dispute between Mr. Woodmore's father and Mr. Woodmore's ex-wife in the midst of trial constituted actual or apparent judicial bias in contravention of the U.S. Constitution and the federal recusal statute, 28 U.S.C. § 455.

For the reasons discussed below, we reject each of Mr. Woodmore's challenges. Accordingly, exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

---

[1] We also resolved the appeal of Amber Woodmore, the sister of Early and Calvin, in May 2024. Amber challenged the enforceability of her plea agreement that led to her conviction for her involvement in the Woodmore organization. *See United States v. Amber Woodmore*, No. 22-7022, 2024 WL 1359718 (10th Cir. Apr. 1, 2024). The issues in Amber's appeal are not relevant to the instant appeal, so we do not discuss them further.

**I**

**A**

We detailed the factual background related to the Woodmore brothers' arrests and charges in our opinion resolving Calvin's appeal. *See Calvin Woodmore*, 127 F.4th at 201–05. Below, we highlight those facts most pertinent to the resolution of Mr. Woodmore's appeal.

In July 2018, the Sheriff of Haskell County, Oklahoma, informed the Drug Enforcement Administration ("DEA") that an individual in eastern Oklahoma was obtaining quantities of methamphetamine through the mail. The Sheriff explained that he had connected these shipments to an individual named Early Woodmore. Working alongside numerous local, state, and federal law enforcement agencies, the DEA launched a joint investigation into the drug-trafficking activities of the Woodmore organization.

The Woodmore organization consisted of at least a dozen members, including three siblings of the Woodmore family. Mr. Woodmore was the leader of the organization, and he was aided by his brother, Calvin, and their sister, Amber Woodmore ("Amber"). The Woodmore siblings were aided by at least nine other individuals, some of whom were longtime acquaintances of the Woodmore family and fellow residents of eastern Oklahoma.

In August 2017, Mr. Woodmore met Kimberly Noel, who lived in Desert Hot Springs, California, and she soon began to supply the Woodmore organization with methamphetamine. Ms. Noel and Mr. Woodmore devised a shipment and payment

system for their methamphetamine transactions. Every few weeks, Ms. Noel would mail methamphetamine concealed in everyday objects (such as peanut butter jars) from California to various addresses in and around eastern Oklahoma, including the residences of other Woodmore organization associates. Once the packages arrived at the designated destinations, a Woodmore organization associate would retrieve and break down each package of methamphetamine into smaller drug quantities for distribution.

Mr. Woodmore typically tasked Woodmore organization associates with selling the methamphetamine. But Mr. Woodmore also occasionally sold methamphetamine personally. For example, on November 6, 2018, a confidential source for the DEA bought 55.7 grams of methamphetamine from Mr. Woodmore for $800. That methamphetamine was later tested and determined to be "98 percent pure plus or minus four percent"—with a corresponding pure substance weight of "54.5 grams" (that is, a little less than two ounces). R., Vol. IV, at 137 (Trial Tr., Vol. I, dated Apr. 4, 2022).

Ms. Noel typically sent the Woodmore organization one pound of methamphetamine per shipment. According to a DEA agent, the price per pound fluctuated throughout the period of the Woodmore organization's activities, ranging from roughly $2,000 to $4,000. In total, during the course of her business relationship with Mr. Woodmore, Ms. Noel shipped the Woodmore organization between twenty and thirty pounds of methamphetamine. In return, Mr. Woodmore or one of his associates would send Ms. Noel a portion of the proceeds via wire transfer.

4

**2**

In April 2019, roughly a year after the DEA began investigating the Woodmore organization, federal agents obtained arrest warrants for Mr. Woodmore and Calvin for their alleged involvement in an assault on a Woodmore organization associate. Law enforcement officers arrested Calvin on April 2, 2019 and arrested Mr. Woodmore on April 18, 2019. Both Mr. Woodmore and Calvin have been incarcerated since these arrests.

After her brothers' arrests, Amber assumed control of the Woodmore organization's day-to-day operations. However, the Woodmore brothers continued to communicate with Amber about the Woodmore organization's operations from prison. Though Ms. Noel initially stopped sending packages after hearing of Mr. Woodmore's arrest and imprisonment, she resumed sending shipments after speaking with Amber. Amber asked Ms. Noel to change shipment destinations because the Woodmore brothers thought "it was getting hot"—i.e., that law enforcement was closing in on them—after the brothers' arrests. *Id.* at 317 (Trial Tr., Vol. II, dated Apr. 5, 2022). Ms. Noel complied and began sending packages to a motel in Rogers, Arkansas—a location near eastern Oklahoma—where Ms. Noel's sister worked.

On August 15, 2019, investigators planned to seize a package shipped by Ms. Noel that was due to arrive at the Rogers, Arkansas, motel. That evening, Mr. Woodmore called the recipient of the package, Woodmore organization associate Valerie Adcock, on a recorded line from jail and asked her to check if a package had been delivered. Investigators, however, intercepted the package in Arkansas on

August 16, 2019, before it reached the motel.  Subsequent testing revealed that the seized package contained methamphetamine that weighed approximately 444.4 gross grams.  Of that amount, "439.9 gross grams, [or] approximately one pound" was pure methamphetamine.  *Id.* at 832 (Trial Tr., Vol. III, dated Apr. 6, 2022).  This represented a purity level of 99 percent.  After this seizure, Ms. Noel ceased sending packages to the Woodmore organization.

**B**

**1**

On January 14, 2020, a federal grand jury in the Eastern District of Oklahoma indicted Mr. Woodmore and eleven other defendants, including Calvin, Amber, and Ms. Noel.  Mr. Woodmore was charged with five counts: Count One, conspiracy to "knowingly and intentionally distribute 50 grams or more of methamphetamine (actual)," in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846, R., Vol. I, at 91 (Indictment, dated Jan. 14, 2020); Count Two, distribution of 50 grams or more of methamphetamine (actual), in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A), *id.* at 100; Count Nine, conspiracy to commit money laundering, in violation of 18 U.S.C. §§ 1956(a)(1) and 1956(h), *see id.* at 105 (describing the alleged "money laundering conspiracy" (bold typeface and capitalization omitted)); Count Twelve, money laundering, in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) and 2, *see id.* at 109–10 (alleging "laundering [of] monetary instruments" (bold typeface and capitalization omitted)); and Count Twenty, money laundering, in violation of 18

U.S.C. § 1956(a)(1)(B)(i) and 2, *see id.* at 111 (alleging "laundering [of] monetary instruments" (bold typeface and capitalization omitted)).

Mr. Woodmore exercised his right to a jury trial, and he and Calvin proceeded to trial jointly in April 2022.[2]

**2**

A week before trial, the district court held a pretrial conference. During this hearing, the government informed the court that some of the government's witnesses had reported that they were being threatened by family members of the Woodmore brothers. The district court responded that it understood the prosecutor's concerns and that it would address any threats as they arose at trial. The district court also highlighted the danger that witness threats could pose to the proceedings and noted that if threats materialized at trial, there were "going to obviously be some serious consequences." Suppl. R., Vol. I, at 7 (Pretrial Conf. Tr., dated Mar. 30, 2022).

At the first day of trial and prior to jury selection, the government updated the court on the purported witness threats, stating:

> Over the weekend, [the witnesses] have continued to receive threats where members of the defendants' family have threatened to kill at least one or two of our witnesses. I don't know if those members will be present in the courtroom today. I know those witnesses will be here this week. I just want to bring that to the Court's attention in case something happens.

R., Vol. IV, at 83. The district court acknowledged the prosecutor's update.

---

[2]     Mr. Woodmore and Calvin were represented by separate counsel at trial.

Then, during the second day of trial and outside the jury's presence, the government further updated the court, and the following exchange ensued:

> [PROSECUTOR]: Your Honor, two witnesses, one is Lacey Ford, [Mr.] Woodmore's ex-wife. Her daughter is sitting here in this courtroom next to [Mr. Woodmore's] father. He has held on to her since Sunday when he was supposed to return her, and she's [i.e., Lacey Ford is] supposed to be here to testify. They have repeatedly threatened her. Now, they're holding their daughter hostage in this courtroom.
>
> THE COURT: Why would -- this is Early [Woodmore]?
>
> [PROSECUTOR]: This is Early's father in the courtroom.
>
> THE COURT: That's Early's father. What is her connection to Mr. Woodmore?
>
> [PROSECUTOR]: Ex-wife and that is their mutual child. He was supposed to return her on Sunday and has not. The family members have told her [i.e., Lacey Ford], [d]o not come to court. She is one of the people that ha[s] been threatened, Judge.
>
> THE COURT: So does she -- she has custody of the child?
>
> [PROSECUTOR]: Yes. They were there for a visitation for the weekend[,] and he won't give her back. I'm not saying that was wise, Judge. That's what she told our agent this morning.
>
> THE COURT: So do you all know anything about that, [Mr. Woodmore's counsel]? [Calvin Woodmore's counsel]?
>
> [MR. WOODMORE'S COUNSEL]: Obviously, I don't have any copy of any custody order. I don't know what the situation is[,] and I obviously haven't talked with this witness to verify that.
>
> THE COURT: Does she have a custody order?
>
> [PROSECUTOR]: I would have to ask her, Judge.

> THE COURT: Ask her if she has a custody order.  If she has a custody order, then her children will be leaving with her when she shows up.

*Id.* at 372–74.

After a short recess, at the bench outside of the jury's hearing, the district court informed the parties that it had found on the internet a custody report pertaining to Mr. Woodmore and Ms. Ford's child, stating:

> All right.  Counsel, I have pulled the decree of the dissolution of the marriage of Lacey Cheyenne Ford and Early Willard Woodmore, III, from Pittsburg County court docket.  The decree indicates that there are three children.  There's a KAF, a TJW, and ASW.  Those children -- the custody of those children has been awarded to the petitioner in the case, who was Ms. Ford.

*Id.* at 374.

The district court then asked the government if Ms. Ford was in the courthouse, leading to the following exchange:

> [PROSECUTOR]: She is upstairs in our witness room, Judge.
>
> THE COURT: What does she want done with her children?
>
> [PROSECUTOR]: She wants to go home with them today, at least the daughter, Judge.
>
> THE COURT: Does she want them in the courtroom?
>
> [PROSECUTOR]: I can ask her.
>
> THE COURT: Or does she want them in the witness room?
>
> [PROSECUTOR]: I think she would rather have them in the witness room when she testifies.

9

THE COURT: If she wants them in the witness room, the marshals will escort the children to the witness room and there will be no interference with that.

. . . .

THE COURT: . . . Just go check with Ms. Ford.  We'll wait here for a moment and then you can step back[,] and you can come back to the bench.

*Id.* at 374–76.

During a short recess, the prosecutor spoke to Ms. Ford and subsequently reported back to the district court at the bench outside of the jury's hearing:

THE COURT: All right. . . . [H]ave you had an opportunity to talk with Ms. Ford?

[PROSECUTOR]: Yes, your Honor.  She would like both children returned to her upstairs.  She is on the fifth floor in our witness waiting room.

THE COURT: Okay.  The marshals are going to be instructed to escort the children.  Are there three children?  Where's the third child?

[PROSECUTOR]: This is just all they have, your Honor.

THE COURT: So the marshals are going to escort the children up to the third floor to the witness room.

[PROSECUTOR]: Fifth floor.

THE COURT: All right.  So that's going to happen right now.

[PROSECUTOR]: Thank you, Judge.

*Id.* at 377.  At no point in this exchange or throughout the subsequent trial proceedings did Mr. Woodmore's counsel object to the district court's handling of

10

the custody dispute.  Ms. Ford eventually testified at trial as a witness for the government.

3

At trial, the government presented testimony from several co-conspirators of the Woodmore organization, including Ms. Noel, and multiple law enforcement officers.  For example, two DEA agents testified as to the purity weights of two seized samples of methamphetamine that the Woodmore organization sought to or did distribute: the 54.5 grams of pure methamphetamine sold by Mr. Woodmore on November 6, 2018, and the 439.9 grams of pure methamphetamine shipped to the Rogers, Arkansas, motel on August 15, 2019.  Notably, two witnesses—Ashley Miller and Dennis Marshall—testified that they met with prosecutors in advance of trial to discuss their testimony.

After presenting three days of evidence, the government rested its case. Neither Mr. Woodmore nor Calvin testified at trial, and the case was submitted to the jury.

4

Two decisions that the district court made with respect to the jury instructions are relevant on appeal.  First, the district court charged the jury with an instruction that used the term "methamphetamine (actual)" in its description of Count One of the Indictment, which itself used that term.  *Compare* R., Vol. I, at 458 (Jury Instrs., filed Apr. 7, 2022) (noting in a final instruction that Mr. Woodmore "is charged with conspiracy to knowingly and intentionally distribute and/or possess with intent to

11

distribute 50 grams or more methamphetamine (actual), a Schedule II controlled substance"), *with id.* at 91 (Indictment charging Mr. Woodmore with a conspiracy to "knowingly and intentionally distribute 50 grams or more of methamphetamine (actual)"). Apparently anticipating that the court might do so, Mr. Woodmore and Calvin had jointly proposed an instruction that would include a definition for that term. The proposed instruction read:

> In this case, the Defendants are charged with various offenses related to the possession and/or distribution of "Methamphetamine (actual)." Controlled substances are often diluted and combined with other substances as they pass down the chain of distribution. In this case, should you find that Defendants possessed and/or distributed a mixture of [sic] substance containing methamphetamine, you must also determine the amount of methamphetamine (actual) contained therein.
>
> The term "Methamphetamine (actual)" refers to the weight of the controlled substance, itself, contained in the mixture or substance. For example, a mixture weighing 10 grams containing methamphetamine at 50% purity contains 5 grams of Methamphetamine (actual).

R., Vol. I, at 437 (Defs.' Requested Jury Instrs., filed Apr. 7, 2022). As authority for this instruction, Mr. Woodmore and Calvin cited the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines")—specifically, the commentary to U.S.S.G. § 2D1.1. The district court ultimately denied the proposed instruction, finding that it would not "be helpful" to the jury "based upon the evidence." *See* R., Vol. IV, at 916 (Trial Tr., Vol. IV, dated Apr. 7, 2022).

Second, the district court gave an instruction addressing the propriety of attorneys interviewing witnesses before trial. Specifically, the government had

12

proposed an instruction regarding the rights of attorneys to interview witnesses prior to trial.[3]  In full, that instruction read:

### Right of Attorney to Interview Witnesses

An attorney has the right to interview his witnesses for the purpose of learning the testimony those witnesses will give.  The fact that the witness has talked to an attorney and told the attorney what he or she would testify to does not, by itself, reflect adversely on the truth of the testimony of the witness.

R., Vol. I, at 205 (Pl.'s Requested Jury Instrs., dated Feb. 26, 2021).  Mr. Woodmore objected to the proposed instruction, stating that the instruction was "not a pattern instruction from the Tenth Circuit" and that the second sentence of the instruction "would [not] fit this situation."  R., Vol. IV, at 895.  However, Mr. Woodmore's counsel also stated that he had "no problem with the court instructing that an attorney has the right to interview witnesses."  *Id.*  When asked if either of the sentences of the instruction "contain[ed] [an] inaccurate statement[] of the law," Mr. Woodmore's counsel responded, "[n]ot necessarily, your Honor.  I do know that this is not a pattern instruction."  *Id.* at 895–96.

Subsequently, Calvin's counsel objected to the instruction, disagreeing with the premise that "an attorney has a right to interview witnesses."  *Id.* at 896.  In response, the district court edited the instruction to read that "an attorney *may* have the right" as opposed to "an attorney *has* the right," but in all other respects the instruction remained the same.  *See id.* at 896–97 (emphasis added); R., Vol. I, at

---

[3]     Recall that both Ms. Miller and Mr. Marshall testified that they met with prosecutors in advance of trial to discuss their testimony.

453.  Mr. Woodmore then "suggest[ed] [that] instead of using the word 'right,' [they] use the word 'opportunity,'" but the district court "noted and overruled" this suggestion.  R., Vol. IV, at 897.  The following day, after Mr. Woodmore was provided with a new copy of the jury instructions, he raised the "[s]ame objection as yesterday" with respect to the instruction.  *Id.* at 917.  The district court once again noted and overruled his objection.  *Id.*  The final instruction that the court delivered to the jury read:

**RIGHT OF ATTORNEY TO INTERVIEW WITNESSES**

> An attorney may have the right to interview witnesses for the purpose of learning the testimony those witnesses will give. The fact that a witness has talked to an attorney and told the attorney what he or she would testify to does not, by itself, reflect adversely on the truth of the testimony of the witness.

R., Vol. I, at 453.

**5**

At the conclusion of trial, the jury convicted Mr. Woodmore on all five counts. R., Vol. III, at 105–06 (Verdict Form, dated Apr. 7, 2022).  In connection with Count One, the jury determined that "[a]t least 50 grams or more" of methamphetamine was attributable to Mr. Woodmore "as a result of his own conduct and the conduct of the other co-conspirators that was reasonably foreseeable to him."  *Id.* at 105; R., Vol. IV, at 1049.

**6**

Mr. Woodmore appeared before the district court for sentencing on August 4, 2023.  His Guidelines imprisonment range was life as to each of Counts One and

14

Two and 240 months (the statutory maximum) as to each of Counts Nine, Twelve, and Twenty. The district court sentenced Mr. Woodmore to life imprisonment as to each of Counts One and Two and 240 months as to each of Counts Nine, Twelve, and Twenty, with the sentences to run concurrently.

**7**

The district court entered final judgment, and Mr. Woodmore timely filed his notice of appeal. We have jurisdiction over his appeal pursuant to 28 U.S.C. § 1291.

**II**

Mr. Woodmore raises three challenges to his convictions. First, he argues—based on constitutional and statutory grounds—that the district court's resolution of an apparent custody dispute at trial evinced actual or apparent judicial bias. Second, he contends that the district court erred by delivering an instruction to the jury involving the right of attorneys to interview witnesses prior to trial. Third, he argues that the district court erred by failing to provide the jury with a definitional instruction for the term "methamphetamine (actual)."

We address each argument in turn. Concluding that Mr. Woodmore's arguments are unavailing, we decline to disturb each of the district court's rulings.

**A**

We first review Mr. Woodmore's judicial bias challenge. Mr. Woodmore argues—based on constitutional and statutory grounds—that the district court's resolution of an apparent custody dispute during trial in response to the government's allegations of witness intimidation exhibited actual or apparent judicial bias.

15

**1**

Mr. Woodmore acknowledges that he failed to object at trial to the district court's actions that he now argues evinced actual or apparent judicial bias, and he therefore requests we review only for plain error. *See United States v. McGehee*, 672 F.3d 860, 873 (10th Cir. 2012) ("[W]here a defendant has forfeited an issue in the district court, in order to prevail [on appeal], a defendant must make a sufficient showing of error under the plain-error standard.").

"'A party seeking relief under the plain-error rubric bears the burden of showing "(1) an error, (2) that is plain, which means clear or obvious under current law, and (3) that affects substantial rights."'" *United States v. B.N.M.*, 107 F.4th 1152, 1170 (10th Cir. 2024) (quoting *United States v. Finnesy*, 953 F.3d 675, 684 (10th Cir. 2020)). "If these factors are met, [this court] may exercise discretion to correct the error if (4) it seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (alteration in original) (quoting *Finnesy*, 953 F.3d at 684). Importantly, we "apply the plain error rule less rigidly when reviewing a potential constitutional error." *United States v. Starks*, 34 F.4th 1142, 1157 (10th Cir. 2022) (quoting *United States v. Dalton*, 918 F.3d 1117, 1130 (10th Cir. 2019)); *accord United States v. Magallanez*, 408 F.3d 672, 683 (10th Cir. 2005) ("[T]he plain error test is applied less rigorously in the context of alleged constitutional error than in the context of non-constitutional error.").

**2**

**a**

"The Due Process Clause entitles a person to an impartial and disinterested tribunal in both civil and criminal cases." *United States v. Nickl*, 427 F.3d 1286, 1298 (10th Cir. 2005) (quoting *Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980)). "To demonstrate a violation of due process because of judicial bias, a claimant must show either actual bias or an appearance of bias." *Id.*  Recusal is required for a judge "if sufficient factual grounds exist to cause a reasonable, objective person, knowing all the relevant facts, to question the judge's impartiality." *Id.* (quoting *United States v. Pearson*, 203 F.3d 1243, 1277 (10th Cir. 2000)).  But "[a] judge's actual state of mind or prejudice is not at issue"; instead, we employ a "purely objective" standard for determining judicial bias, in which "[t]he inquiry is limited to outward manifestations and reasonable inferences drawn therefrom." *Id.* (second alteration in original) (quoting *United States v. Cooley*, 1 F.3d 985, 993 (10th Cir. 1993)).

"Ordinarily, when a judge's words or actions are motivated by events originating within the context of judicial proceedings, they are insulated from charges of bias." *Id.*  As a result, "[a]dverse rulings alone do not demonstrate judicial bias." *Bixler v. Foster*, 596 F.3d 751, 762 (10th Cir. 2010); *see also Green v. Branson*, 108 F.3d 1296, 1305 (10th Cir. 1997) ("[A]dverse rulings 'cannot in themselves form the appropriate grounds for disqualification.'" (quoting *Green v. Dorrell*, 969 F.2d 915, 919 (10th Cir. 1992))).  Similarly, "'[a] judge's ordinary efforts at courtroom administration,' even if 'stern and short-tempered,' are 'immune' from charges of

17

bias and partiality." *Nickl*, 427 F.3d at 1298 (alteration in original) (quoting *Liteky v. United States*, 510 U.S. 540, 556 (1994)).

However, "when a judge's decisions, opinions, or remarks stem from an extrajudicial source—a source outside judicial proceedings," recusal may be warranted. *Id.* Recusal is required "when a judge's actions or comments 'reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.'" *Id.* (quoting *Liteky*, 510 U.S. at 555). For example, "[c]ourts have found an impermissible level of bias when a judge's remarks or actions reveal he has prejudged the guilt of a defendant." *Id.*

**b**

Under 28 U.S.C. § 455, the federal recusal statute, a judge must "disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* § 455(a). Additionally, when a judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding," he must also recuse himself. *Id.* § 455(b)(1).

"We have explained that 'disqualification is appropriate only where a reasonable person, were he to know all the circumstances, would harbor doubts about the judge's impartiality.'" *United States v. Mendoza*, 468 F.3d 1256, 1261–62 (10th Cir. 2006) (quoting *In re McCarthey*, 368 F.3d 1266, 1269 (10th Cir. 2004)); *see also Pearson*, 203 F.3d at 1277 ("A judge has a continuing duty to recuse under § 455(a) if sufficient factual grounds exist to cause a reasonable, objective person, knowing all the relevant facts, to question the judge's impartiality."). As the reasonable person

18

test suggests, the statutory recusal standard also is "purely objective," and "[t]he inquiry is limited to outward manifestations and reasonable inferences drawn therefrom." !*United States v. Martinez*, 92 F.4th 1213, 1255 (10th Cir. 2024) (quoting *Cooley*, 1 F.3d at 993). "In applying the [objective] test, the initial inquiry is whether a reasonable factual basis exists for calling the judge's impartiality into question." *Id.* (alteration in original) (quoting *Cooley*, 1 F.3d at 993).

"'In conducting this review, we must ask how these facts would appear to a well-informed, thoughtful and objective observer,' who is 'an average member of the public,' not a 'hypersensitive, cynical, and suspicious person.'" *Id.* (emphasis omitted) (quoting *Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1310 (10th Cir. 2015)). Importantly, "cases within § 455(a) are extremely fact driven 'and must be judged on [their] unique facts and circumstances more than by comparison to situations considered in prior jurisprudence.'" *Nichols v. Alley*, 71 F.3d 347, 351 (10th Cir. 1995) (alteration in original) (quoting *United States v. Jordan*, 49 F.3d 152, 157 (5th Cir. 1995)).

We have emphasized that § 455 "must not be so broadly construed that it becomes, in effect, presumptive, so that recusal is mandated upon the merest unsubstantiated suggestion of personal bias or prejudice." *Martinez*, 92 F.4th at 1255 (quoting *Cooley*, 1 F.3d at 993). "Indeed, it should not be forgotten that '[t]here is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is.'" *Id.* at 1255–56 (alteration in original) (quoting *Hinman v. Rogers*, 831 F.2d 937, 939 (10th Cir. 1987)).

19

**3**

Mr. Woodmore argues that the "[t]he district court's response to the [government's] allegations of witness intimidation exhibited judicial bias or apparent bias, and reversal is required on constitutional and statutory grounds."  Aplt.'s Opening Br. at 13 (bold typeface omitted).  He first argues that the district court's actions violated his due process rights under the Fifth Amendment, and he next argues that the district court's actions violated the purportedly "more stringent statutory requirement" for recusal under § 455.  *Id.* at 18 (bold typeface omitted).  We discuss each of Mr. Woodmore's arguments below.

**a**

Mr. Woodmore contends that his due process rights were violated by the district court's resolution of the incident surrounding the presence of Mr. Woodmore and Ms. Ford's daughter in the courtroom alongside Mr. Woodmore's father.  Recall that during trial the government notified the district court that Mr. Woodmore's daughter was "sitting [] in th[e] courtroom next to [Mr. Woodmore's] father," who had allegedly kept her "since Sunday when he was supposed to return her" to her mother, Ms. Ford, who was scheduled to testify at trial as a government witness.  R., Vol. IV, at 372.  The district court resolved the conundrum by finding an online copy of the divorce decree—which stated that the children of Mr. Woodmore and Ms. Ford were legally in the custody of Ms. Ford—and later directing the marshals in the courtroom to return the children (including the daughter, who had been sitting with Mr. Woodmore's father) to Ms. Ford.

20

Mr. Woodmore now argues that the district court's actions and statements "exhibited bias or the appearance of bias" because "[t]he district court did not hear from the witness directly," "[t]he district court did not ask Mr. Woodmore's father for any explanation," and "the district court did not question the child." Aplt.'s Opening Br. at 16. Instead, Mr. Woodmore asserts, the district court "accepted the [government's] unsupported allegation as gospel, conducted its own very brief investigation by obtaining a custody order apparently available to the court through online records from the applicable local family court in Oklahoma, and summarily ordered multiple children into the custody of the U.S. Marshals Service with instructions to them to escort the children to the [] witness room." Id. Mr. Woodmore then states that the district court "ha[d] no authority over local family court or child custody or visitation matters" and did not "have a clue" that, in fact, "Mr. Woodmore's father was court-approved for temporary visitation." Id. at 16. And he labels the "use of the force of the U.S. Marshals Service to interfere in this family matter" as "*an extraordinary act* that revealed either the court's bias in favor of the [government] or bias against Mr. Woodmore." Id. at 16–17 (emphasis added).

Applying our plain-error framework, Mr. Woodmore argues that the alleged due process violation is a "plain" error (presumably meaning clear or obvious error) because "taking the [government's] word for the incendiary allegation that Mr. Woodmore's father was holding the child hostage in order to intimidate a [government] witness reflects and gives the appearance of judicial bias." Id. at 17. Next, he argues that the third prong of plain-error review is satisfied because "the

21

error was structural." *Id.* Finally, to establish the fourth prong, he argues that "[t]he Supreme Court has reasoned that state codes of judicial conduct incorporating the ABA principle that judges should avoid even an appearance of impropriety 'serve to maintain the integrity of the judiciary and the rule of law.'" *Id.* at 17–18 (quoting *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 889 (2009)).

However, we conclude that Mr. Woodmore's due process challenge fails to satisfy even the first prong of the plain-error rubric—a showing of error. Specifically, the district court's conduct here is "immune" from a charge of "bias and partiality" because its conduct simply amounted to "ordinary efforts at courtroom administration." *Nickl*, 427 F.3d at 1298. While acting to maintain a setting of order and proper decorum for witness testimony, the district court was faced with an apparent custody dispute between Mr. Woodmore's father and Ms. Ford, a forthcoming government witness. To resolve the dispute and to ensure the orderly continuation of the proceedings, the district court first asked questions to both the government and Mr. Woodmore's counsel to better understand the situation at hand. It bears underscoring that Mr. Woodmore's counsel was given an equal opportunity by the court to shed light on the situation as Mr. Woodmore's advocate. Yet Mr. Woodmore's counsel responded that he did not "have any copy of any custody order" or "know what the situation is." R., Vol. IV, at 373. The district court nevertheless had a job to do. It needed to establish the conditions for the upcoming, scheduled witness testimony of Ms. Ford by resolving—in some manner—this custody dispute.

Not unreasonably, the court sought to do so by retrieving a divorce decree online that appeared to clarify the children's custody status. After learning from that decree that Ms. Ford had custody of the children whom Mr. Woodmore fathered—including the daughter sitting with Mr. Woodmore's father—and that Ms. Ford wanted the children brought to her in the witness room, the court resolved the dispute by directing the marshals to bring the children to Ms. Ford, their mother. The "reasonable inferences" to be drawn from these "outward manifestations" are that the district court was merely attempting to efficiently resolve a dispute in its courtroom that had the potential to affect the delivery of forthcoming witness testimony and that the court acted without partiality in its efforts to do so. *Nickl*, 427 F.3d at 1298. Indeed, even if the district court had handled the dispute in a "stern and short-tempered" manner—which it did not—its actions would seemingly have been immune from allegations of bias. *Id.*

Although Mr. Woodmore makes many assertions as to how the district court could have better handled the situation, none of these assertions are relevant to our judicial bias analysis under the Due Process Clause. We are tasked only with determining whether "sufficient factual grounds exist to cause a reasonable, objective person, knowing all the relevant facts, to question the judge's impartiality." *Id.* In this case, no reasonable, objective person would conclude that the district court was exhibiting bias towards the government by proactively and efficiently resolving a custody dispute that threatened to imperil the delivery of witness testimony in the trial over which it presided.

23

Finally, while Mr. Woodmore characterizes the district court's use of the U.S. Marshals Service as an "extraordinary act" that demonstrated bias, it is beyond peradventure that there is nothing improper about a district court using the U.S. Marshals Service to enforce courtroom decorum so that testimony may be delivered in an orderly fashion. *See Martinez v. Winner*, 771 F.2d 424, 434 (10th Cir. 1985) ("[I]t is the judge's responsibility to exercise control over the courtroom and take security precautions during a trial. . . .  Usually this sort of thing is delegated to the United States Marshal or to court security officers . . . ."), *vacated on other grounds sub nom. Tyus v. Martinez*, 475 U.S. 1138 (1986); *see also Coando v. Westport Resources*, 85 F. App'x 59, 62–63 (10th Cir. 2003) (holding that a district court judge did not demonstrate bias against a plaintiff by allegedly arranging for at least fifteen United States Marshals to sit and stand around the plaintiff in the courtroom because these actions were "steps to preserve courtroom decorum").[4]

Therefore, we conclude that Mr. Woodmore's constitutional contention of judicial bias is without merit.  The district court's conduct did not violate Mr. Woodmore's due process rights.  Accordingly, Mr. Woodmore cannot even surmount the first hurdle of the plain-error standard on his constitutional claim: a showing of error.

---

[4]    We rely on unpublished cases for their persuasive value and do not treat them as binding precedent. *See United States v. Engles*, 779 F.3d 1161, 1162 n.1 (10th Cir. 2015).

**b**

Mr. Woodmore next argues that "[t]he district court's actions also violated the more stringent statutory requirement for recusal set forth in 28 U.S.C. § 455." Aplt.'s Opening Br. 18 (bold typeface omitted). In support, Mr. Woodmore directs us to the arguments he raised in his due process analysis and claims those arguments satisfy all four prongs of the plain-error rubric. *Id.* at 19 ("For the reasons discussed *supra* regarding Mr. Woodmore's due-process claim, the unusual factual circumstances here also violate Congressional mandates. . . . As discussed, the facts here reflect a pro-[government] bias and a bias against Mr. Woodmore."). The government counters that Mr. Woodmore solely relies on the district court's "conduct of the trial itself" and that Mr. Woodmore has not established the elements of our plain-error rubric. Aplee.'s Resp. Br. at 19.

In our view, Mr. Woodmore's challenge under the federal recusal statute fails because he has not adequately briefed his argument. Under the doctrine of appellate-briefing waiver, a litigant "may waive appellate review of an issue by not arguing it—or arguing it in an inadequate manner—in one's opening brief." *See In re Syngenta AG MIR 162 Corn Litig.*, 61 F.4th 1126, 1181 (10th Cir. 2023). This rule applies to arguments that "are advanced in an opening brief only 'in a perfunctory manner.'" *United States v. Walker*, 918 F.3d 1134, 1151 (10th Cir. 2019) (quoting *United States v. Wooten*, 377 F.3d 1134, 1145 (10th Cir. 2004)). "[C]ursory statements, without supporting analysis and case law, fail to constitute the kind of briefing that is necessary" to preserve an issue for our review. *Bronson v. Swensen*,

25

500 F.3d 1099, 1105 (10th Cir. 2007); *see also Toevs v. Reid*, 685 F.3d 903, 911 (10th Cir. 2012) ("Arguments not clearly made in a party's opening brief are deemed waived.").

The doctrine of appellate-briefing waiver applies with full force to Mr. Woodmore's statutory challenge. Mr. Woodmore's argument under § 455 only features a conclusory explanation that directs us to his argument under the Due Process Clause. More concerningly, Mr. Woodmore does not even apply the test for § 455 to our plain-error rubric, a critical omission in light of Mr. Woodmore's own contention that § 455 involves a different legal standard than a constitutional challenge to judicial bias under the Due Process Clause (a contention that we have no occasion to opine on here). Crucially, some prongs of the plain-error rubric require specific, concrete showings that Mr. Woodmore does not make—for example, Mr. Woodmore is required to point us to controlling precedent that the district court's actions contravened in order to establish a clear or obvious error at prong two. *See Starks*, 34 F.4th at 1157 (stating that for an error to be a clear or obvious error at prong two, "either the Supreme Court or this court must have addressed the issue") (quoting *United States v. Ruiz-Gea*, 340 F.3d 1181, 1187 (10th Cir. 2003)). Therefore, Mr. Woodmore's failure to adequately brief his § 455 argument is fatal to his plain-error challenge. *See In re Syngenta*, 61 F.4th at 1181; *Walker*, 918 F.3d at 1151; *see also Utahns for Better Transp. v. United States Dep't of Transp.*, 305 F.3d 1152, 1175 (10th Cir. 2002) ("[I]ssues will be deemed waived if they are not adequately briefed."); *Northington v. Jackson*, 973 F.2d 1518, 1521 (10th Cir. 1992)

26

("[T]he court should not assume the role of advocate, and should dismiss claims which are supported only by vague and conclusory allegations.").[5]

\* \* \*

In sum, either on constitutional or statutory grounds, Mr. Woodmore's arguments for judicial bias fail to carry the day. And, accordingly, we reject them.

**B**

Mr. Woodmore next argues that the district court made two instructional errors. First, he argues that the district court erred by issuing an instruction that an attorney may have the right to interview witnesses. Second, Mr. Woodmore argues that the district court erred by not including a definition for the term

---

[5] Even if we were to reach the merits of Mr. Woodmore's § 455 challenge, we would reject this challenge. It does not even pass muster under the first prong of the plain-error test. A "reasonable factual basis" to call the district court's "impartiality into question" does not exist here because the district court's conduct simply constituted an effort to resolve an issue that could have affected the orderly delivery of testimony at trial. *Martinez*, 92 F.4th at 1255. The record reflects that not a single comment, question, or other "outward manifestation" by the district court in resolving the custody dispute evinces that the district court was partial towards the government or against Mr. Woodmore. *Id.* Mr. Woodmore effectively calls on us to nitpick the district court's actions or inactions—specifically, its failure to ask certain questions to Mr. Woodmore, Mr. Woodmore's father, and the child. This we will not do. He also seeks to have us apply the lens of a "hypersensitive, cynical, and suspicious person"; however, our precedent rejects such an approach. *Id.* Thus, in considering the "unique facts and circumstances" here, we cannot conclude that the district court was required to sua sponte recuse itself under § 455. *Nichols*, 71 F.3d at 351. As a result, Mr. Woodmore has not even carried his burden as to the first prong of the plain-error test: a showing of error. Accordingly, even if his argument were not waived (and it is) we would conclude that it fails on the merits.

27

"methamphetamine (actual)" in the instructions.  We address each of Mr.
Woodmore's arguments below and conclude that they are unavailing.

**1**

"We review the jury instructions de novo and view them in the context of the
entire trial to determine if they accurately state the governing law and provide the
jury with an accurate understanding of the relevant legal standards and factual issues
in the case."  *United States v. Freeman*, 70 F.4th 1265, 1278 (10th Cir. 2023)
(quoting *United States v. Thomas*, 749 F.3d 1302, 1312 (10th Cir. 2014)).  "'In doing
so, we consider whether the district court abused its discretion in "shaping or
phrasing . . . a particular jury instruction" and deciding to give or refuse a particular
instruction.'"  *Id.* (omission in original) (quoting *Thomas*, 749 F.3d at 1312–13).  "A
district court abuses its discretion when its decision is 'arbitrary, capricious or
whimsical' or falls outside 'the bounds of permissible choice in the circumstances.'"
*United States v. Olea-Monarez*, 908 F.3d 636, 639 (10th Cir. 2018) (quoting *United
States v. Mares*, 441 F.3d 1152, 1156 (10th Cir. 2006)).  "Typically, '[t]he
appropriate standard of review for challenges to jury instructions is whether the jury,
considering the instructions as a whole, was misled.'"  *United States v. Dowlin*, 408
F.3d 647, 664 (10th Cir. 2005) (alteration in original) (quoting *United States v.
Smith*, 13 F.3d 1421, 1424 (10th Cir. 1994)).

"[A] trial judge is given substantial latitude and discretion in tailoring and
formulating the instructions so long as they are correct statements of law and fairly
and adequately cover the issues presented."  *United States v. Wood*, 207 F.3d 1222,

28

1235 (10th Cir. 2000) (quoting *United States v. Pack*, 773 F.2d 261, 267 (10th Cir. 1985)).  "We do not require a district court to give another instruction 'if it would simply give the jury a clearer understanding of the issues.'"  *United States v. Murry*, 31 F.4th 1274, 1293 (10th Cir. 2022) (quoting *United States v. Williamson*, 746 F.3d 987, 990 (10th Cir. 2014)).  "The instructions as a whole need not be flawless, but we must be satisfied that, upon hearing the instructions, the jury understood the issues to be resolved and its duty to resolve them."  *United States v. Ransom*, 642 F.3d 1285, 1288 (10th Cir. 2011) (quoting *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 552 (10th Cir. 1999)).  If we determine that the district court erred in instructing the jury, "instructional errors are subject to harmless error review."  *United States v. Benvie*, 18 F.4th 665, 670 (10th Cir. 2021).

**2**

**a**

Mr. Woodmore challenges the district court's instruction on the "Right of Attorney to Interview Witnesses."  The challenged instruction delivered to the jury read:

### RIGHT OF ATTORNEY TO INTERVIEW WITNESSES

An attorney may have the right to interview witnesses for the purpose of learning the testimony those witnesses will give. The fact that a witness has talked to an attorney and told the attorney what he or she would testify to does not, by itself, reflect adversely on the truth of the testimony of the witness.

R., Vol. I, at 453.  Mr. Woodmore first states that he preserved his objection to this instruction at trial.  He then argues that the instruction was erroneous because "[n]o

29

attorney has 'the right' to meet with witnesses before trial" and, instead, that "it was the witnesses' *choice* to meet with federal prosecutors before Mr. Woodmore's trial." Aplt.'s Opening Br. at 21.  Further, Mr. Woodmore contends that the instruction prevented the jurors from assessing whether "the witnesses' decisions [i.e., choices] to meet with the [government] to discuss their testimony in advance of Mr. Woodmore's trial reflected their bias in favor of the [government]." *Id.*[6]

The government responds that Mr. Woodmore's challenge to this instruction "should be reviewed for plain error only" because, after lodging an objection at trial, Mr. Woodmore "proceeded to state that he had 'no problem with the court instructing that an attorney has the right to interview witness[es]' and he conceded that the instruction did not contain an inaccurate statement of the law."  Aplee.'s Resp. Br. at 23 (alteration in original) (quoting R., Vol. IV, at 895).  The government then argues that, regardless of the standard of review, Mr. Woodmore fails to show that the district court committed an error because the challenged instruction is similar to an instruction we affirmed in *United States v. John*, 849 F.3d 912 (10th Cir. 2017).

---

[6]     The apparent logic of this prevention theory is that because the instruction, in Mr. Woodmore's view, erroneously told the jury that the government attorneys had the right to interview the witnesses, the jury would have mistakenly believed that the witnesses had no choice but to meet with the prosecutors. Consequently, so the logic goes, Mr. Woodmore would have been prevented from contending that the free choice of witnesses to speak with the government indicated their bias in favor of the government.

**i**

As an initial matter, Mr. Woodmore has not preserved his appellate challenge to the "Right of Attorney to Interview Witnesses" instruction. This challenge is effectively waived because Mr. Woodmore failed to raise the specific theories underlying the challenge before the district court, and he does not argue for plain-error review on appeal. *See, e.g.*, *United States v. McBride*, 94 F.4th 1036, 1045 (10th Cir. 2024) ("Because [Defendant] both failed to preserve [his] arguments below and failed to argue plain error here, [his] arguments have 'come to the end of the road and [are] effectively waived.'" (last alteration in original) (quoting *Fish v. Kobach*, 840 F.3d 710, 729–30 (10th Cir. 2016))).

At trial, Mr. Woodmore only objected on the bases that (1) the instruction was not a Tenth Circuit Pattern Instruction and (2) the second sentence of the instruction "would [not] fit this situation." R., Vol. IV, at 895. Mr. Woodmore's trial counsel explicitly stated that "*certainly [he] ha[d] no problem with* the court instructing that an attorney has the right to interview witnesses." *Id.* (emphasis added). When asked if either of the sentences "contain[ed] [an] inaccurate statement[] of the law," Mr. Woodmore's counsel replied, "[n]ot necessarily, your Honor. I do know that this is not a pattern instruction." *Id.* at 895–96.

Mr. Woodmore now argues on appeal that the instruction was erroneous because "[n]o attorney has 'the right' to meet with witnesses before trial" and, instead, that "it was the witnesses' *choice* to meet with federal prosecutors before Mr. Woodmore's trial." Aplt.'s Opening Br. at 21. Yet this is precisely the proposition

31

that Mr. Woodmore's counsel indicated that he had "no problem with" before the district court. R., Vol. IV, at 895. In other words, in the district court, Mr. Woodmore did not lodge an objection to the attorney-right language of the instruction—thus forfeiting any such objection. And because he does not advance the objection on appeal under the plain-error framework, he has effectively waived it.

To be sure, Mr. Woodmore stresses that he "specifically objected to the second sentence of the instruction," Aplt.'s Reply Br. at 10—when remarking that the sentence did not "fit this situation," R., Vol. IV, at 895—and he contends that this objection preserved his appellate argument that the instruction "limited the jurors' ability to assess witness credibility adversely based on the witness having interviewed with an attorney before trial," Aplt.'s Reply Br. at 10. Seemingly with the aim of providing supportive context, Mr. Woodmore directs us to the following passage:

> I really don't believe that the second sentence would fit this situation. *That if a witness has told somebody here she would testify -- what he or she would testify to is not by itself reflective as adverse to the testimony of the witness.*

R., Vol. IV, at 895 (emphasis added). However, we reject Mr. Woodmore's preservation contention. We would be hard pressed to conclude that this passage preserved *any* objection—let alone the specific objection that Mr. Woodmore advances on appeal.

Specifically, under the federal rules, in challenging jury instructions, a party "must inform the court of the specific objection and the grounds for the objection."

FED. R. CRIM. P. 30(d); *see Brothers v. Johnson*, 105 F.4th 1279, 1284 (10th Cir. 2024) ("To preserve an objection to jury instructions on appeal, the objection at the district court 'must distinctly state the matter objected to and the grounds for the objection.'" (quoting *Allan v. Springville City*, 388 F.3d 1331, 1333 (10th Cir. 2004))); *Medlock*, 164 F.3d at 553 ("Because the purpose of the objection is to give the court an opportunity to correct any mistake before the jury enters deliberations, an excessively vague or general objection to the propriety of a given instruction is insufficient to preserve the issue for appeal." (citation omitted)); *see also United States v. Bader*, 678 F.3d 858, 867 (10th Cir. 2012) (noting a defendant's "obligation to lodge a timely and specific objection" to a jury instruction).

In this passage, Mr. Woodmore merely noted enigmatically that the second sentence did not "fit this situation," without offering any legal theory for why this was so. And though Mr. Woodmore suggests to the contrary, the italicized language in the passage does not offer such a theory. Indeed, it appears to be nothing more than a paraphrase by Mr. Woodmore's counsel of the gist of the second sentence in an attempt (however weak) to bolster his lack-of-fit point. More pointedly, the language of this passage (including the italicized portion) does not use the term "credibility" or say anything about the second sentence having the improper effect of limiting jurors' ability to assess witnesses' credibility based on their decision to meet with the government regarding their testimony. Therefore, we cannot conclude that Mr. Woodmore's objection to the second sentence had the effect of preserving the prevention argument that he advances on appeal. And because Mr. Woodmore does

33

not press this argument under the plain-error rubric on appeal, it is effectively waived.

Lastly, if the foregoing were not enough (and it is) to establish that Mr. Woodmore has forfeited and effectively waived his appellate challenge to the instruction at issue, there is the matter of Mr. Woodmore's failure to respond affirmatively when asked by the court whether either of the two sentences of the instruction were an incorrect legal statement.  Recall that when asked if either of the sentences of the instruction "contain[ed] [an] inaccurate statement[] of the law," Mr. Woodmore's counsel responded, *"[n]ot necessarily*, your Honor."  R., Vol. IV, at 895 (emphasis added).  As we have noted, "the purpose of the objection is to give the court an opportunity to correct any mistake." *Medlock*, 164 F.3d at 553; *accord Bader*, 678 F.3d at 867; *Davoll v. Webb*, 194 F.3d 1116, 1140 (10th Cir. 1999).

Mr. Woodmore's negative response to the court's direct inquiry regarding whether either of the two sentences of the instruction were legally flawed reduced to almost the vanishing point the court's opportunity to correct any legal mistake in the sentences.  Contrary to the suggestion of Mr. Woodmore, it is of no moment—for forfeiture-effective-waiver purposes—whether Mr. Woodmore's negative response amounted to an outright "concession" that the sentences were free from legal error.  Aplt.'s Reply Br. at 11 n.2.  What matters is that Mr. Woodmore did not specifically and distinctly argue to the court that the two sentences *were* legally erroneous—let alone on the grounds that he presents on appeal.  And he does not invoke the plain-

34

error rubric on appeal in challenging those two sentences of the instruction.

Accordingly, his appellate challenge is effectively waived.

In sum, Mr. Woodmore's challenge to the "Right of Attorney to Interview Witnesses" instruction is effectively waived because Mr. Woodmore failed to raise the specific theories underlying that challenge before the district court, and he does not argue for plain-error review on appeal. *See, e.g.*, *McBride*, 94 F.4th at 1045.[7]

## ii

Even if we were to overlook Mr. Woodmore's waiver, his challenge nonetheless would fail under our demanding plain-error rubric.[8]  Mr. Woodmore

---

[7]    To be sure, Mr. Woodmore argues in his reply brief that his challenge to the instruction was preserved at trial because Calvin's counsel lodged a more complete challenge to the instruction.  Although Mr. Woodmore is correct that Calvin's counsel directly challenged the instruction as erroneous, Mr. Woodmore did not thereafter adopt Calvin's challenge as his own.  Instead, Mr. Woodmore only offered a "suggest[ion]" to the district court to improve the instruction.  R., Vol. IV, at 897.  Generally, a defendant cannot rely for preservation purposes on the objections of a co-defendant to a jury instruction unless the defendant individually joined that objection at trial.  *See United States v. Ray*, 370 F.3d 1039, 1043–44 (10th Cir. 2004) (concluding that an objection was unpreserved because "a party can rely upon the objection of his codefendant only if he joins in the objection" (quoting *United States v. Harris*, 104 F.3d 1465, 1471 (5th Cir. 1997))), *vacated on other grounds*, 543 U.S. 1109 (2005); *Fortier v. Dona Anna Plaza Partners*, 747 F.2d 1324, 1331 (10th Cir. 1984) ("The objections by the co-defendants were clearly not made on behalf of [Defendant], and [Defendant] cannot now use the objections of his co-defendants to cure his own failure to object.").  Nothing in the record suggests that Mr. Woodmore was adopting Calvin's challenges at trial as his own or that Mr. Woodmore and Calvin were seeking to raise objections on behalf of each other at trial.  Rather, the record reflects that the district court asked each counsel for their objections separately throughout trial.

[8]    We resolved Calvin's preserved challenge to this instruction under the abuse of discretion standard.  *See Calvin Woodmore*, 127 F.4th at 219 ("[W]e conclude that the district court did not abuse its discretion by delivering the 'Right of

cannot establish that the district court erred at the first step of that rubric. In this

regard, Mr. Woodmore's challenge to the instruction is essentially identical to

Calvin's challenge in his appeal,[9] and we resolved that challenge against Calvin. *See*

---

Attorney to Interview Witnesses' instruction."). However, because we go no further than the first prong of the plain-error rubric—i.e., error *vel non*—in considering the merits of Mr. Woodmore's challenge, that distinction is not material to our analysis. As the party seeking reversal, Mr. Woodmore bears the burden of proof on that error question—whether we are reviewing a preserved challenge or whether we are reviewing a forfeited one under the plain-error standard. *Compare, e.g., Madron v. Astrue*, 646 F.3d 1255, 1257 (10th Cir. 2011) (explaining that, in abuse of discretion review, "it is the appellant's obligation to shoulder the burden of showing an error of this magnitude has occurred"), *with Finnesy*, 953 F.3d at 684 (stating that "[a] party seeking relief under the plain-error rubric bears the burden of showing '[] an error'" (quoting *McGehee*, 672 F.3d at 876)).

[9]    At first blush, Mr. Woodmore's more specific attack on the second sentence of the instruction might appear distinct from the arguments that we addressed in *Calvin Woodmore*. Recall that the second sentence of the instruction reads: "The fact that a witness has talked to an attorney and told the attorney what he or she would testify to does not, by itself, reflect adversely on the truth of the testimony of the witness." R., Vol. I, at 453. Mr. Woodmore contends that the second sentence of the instruction "improperly invade[s] the exclusive province of the jury to assess witness credibility." Aplt.'s Opening Br. at 22; *see* Aplt.'s Reply Br. at 10 (noting that "the second sentence of the instruction . . . limited the jurors' ability to assess witness credibility adversely based on the witness having interviewed with an attorney before trial"). Even if we assume for argument's sake that this attack is appreciably distinct from the ones that we addressed in Calvin's appeal, our reasoning there nevertheless sounds the death knell for Mr. Woodmore's attack.

Without singling out the second sentence, Calvin made the very similar argument "that the instruction had the effect of explaining away any bias resulting from witnesses meeting with attorneys or downplaying any potential for bias that witnesses may have from meeting with the government regarding their testimony." *Calvin Woodmore*, 127 F.4th at 218. Calvin reasoned that this would be so because he understood the instruction as conveying to the jury that the government attorneys had an absolute right to interview witnesses, irrespective of whether they consented to the interview or wanted to meet with the government. In rejecting his argument, we noted that this is "a false, absolutist reading of the instruction." *Id.* at 218.

*Calvin Woodmore*, 127 F.4th at 214–15.  Specifically, in *Calvin Woodmore*, we held

that the "Right of Attorney to Interview Witnesses" instruction that the court

delivered in the Woodmore brothers' trial was not legally erroneous, did not

prejudice defense counsel, and did not prevent the jury from evaluating witness

---

Rather, "the natural reading of this instruction is that attorneys have a right to *ask*
witnesses to meet with them to discuss their trial testimony, but those witnesses may
decline the interviews." *Id.*  Consequently, "we reject[ed] [Calvin's] contention that
the instruction had the effect of explaining away any bias resulting from witnesses
meeting with attorneys or downplaying any potential for bias that witnesses may have
from meeting with the government regarding their testimony." *Id.*  Moreover,
drawing on the reasoning of our decision in *United States v. John*, 849 F.3d 912 (10th
Cir. 2017), we noted that "critically . . . nothing in the instruction's terms prevented
the defense from attacking the motivation or credibility of witnesses for meeting with
the government." *Id.*  Lastly, we noted that

> [e]lsewhere in the jury instructions in this case—specifically, in a
> section entitled "Credibility of Witnesses"—the jury was
> instructed: "You are the sole judges of the credibility or
> 'believability' of each witness and the weight to be given to the
> witnesses' testimony."  This instruction, when viewed in tandem
> with the challenged instruction, would have undercut any
> suggestion in the minds of reasonable jurors that they could not
> consider the bias or lack of credibility of witnesses that might be
> associated with the witnesses meeting with the government to
> discuss their testimony.

*Id.* (citation omitted).  Our reasoning in *Calvin Woodmore* applies with full force to
Mr. Woodmore's specific attack here to the second sentence: it, too, proceeds from
"a false, absolutist reading of the instruction." *Id.*  And, like Calvin, Mr. Woodmore
cannot demonstrate that the second sentence conveyed to the jury that it could not
assess the credibility of witnesses.  Nor did the instruction preclude defense counsel
from attacking witnesses that interviewed with the government as potentially biased
in favor of the government.  Accordingly, even if we assume for argument's sake that
Mr. Woodmore's specific attack on the second sentence of the instruction at issue is
appreciably distinct from the arguments that we addressed in Calvin's appeal, our
reasoning in that latter appeal dooms Mr. Woodmore's attack.

credibility. *See id.* at 215–19. On the merits, we would reach the same conclusion as to Mr. Woodmore's challenge.

A more fulsome explanation of why we affirm the district court's delivery of the "Right of Attorney to Interview Witnesses" instruction is provided in *Calvin Woodmore*. *See id.* at 214–19. Since Mr. Woodmore's challenge to the instruction is essentially identical to the one lodged in *Calvin Woodmore*, our reasoning in that case controls and we must affirm the delivery of the instruction.

\* \* \*

In sum, we conclude that Mr. Woodmore has effectively waived his challenge to the "Right of Attorney to Interview Witnesses" instruction. And even were we to reach the merits of this challenge, we would conclude that it fails at the first prong of the plain-error test for basically the same reasons that we rejected an essentially identical challenge in the appeal of Mr. Woodmore's brother, Calvin.

**b**

Mr. Woodmore last argues that the district court abused its discretion "by declining to define methamphetamine (actual) for the jury." Aplt.'s Opening Br. at 24 (bold typeface omitted). He avers that "[w]ith no guidance as to how to calculate methamphetamine (actual), the jury was left in the dark" and that the jurors "may have interpreted the inclusion of the term 'actual' in the phrase 'methamphetamine (actual)' [in the court's description of Count One of the Indictment] as a means of distinguishing between real methamphetamine and some substance with a different chemical makeup." *Id.* at 25. Relatedly, Mr. Woodmore argues, on plain-error

38

review, that under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) we should "vacate [his] life sentence" on Count Two "for the independent reason that there is no jury finding that Mr. Woodmore distributed 50 grams or more of methamphetamine (actual) as necessary to trigger a maximum sentence of life imprisonment instead of 40 years." *Id.* at 27 (bold typeface omitted). Lastly, he raises a plain-error challenge to the absence of the term "actual" in the elemental instruction for Count Two.

The government argues in response that "a district court need not 'define a statutory term or phrase that carries its natural meaning,'" Aplee.'s Resp. Br. at 27 (quoting *United States v. Robinson*, 435 F.3d 1244, 1249 (10th Cir. 2006)), and that "'[m]ethamphetamine (actual)' is a term that carries its natural meaning," *id.* The government also points to evidence adduced at trial to rebut Mr. Woodmore's contention that the jury was "left in the dark" as to how to calculate methamphetamine (actual). *Id.* at 28–29. As to the *Apprendi* challenge, the government argues that "[t]he jury found [Mr.] Woodmore guilty as charged" and "necessarily [found] that he had distributed at least 50 grams of methamphetamine." *Id.* at 31.

### i

We conclude that the district court did not abuse its discretion by failing to charge the jury with a definitional instruction for the term "methamphetamine (actual)." Mr. Woodmore's challenge to this instruction is materially identical to a challenge made by Calvin to the same instruction in his appeal, and we resolved that

39

challenge against Calvin. *See Calvin Woodmore*, 127 F.4th at 210–14.[10]  In particular, we determined that a reasonable juror would have understood that the term "methamphetamine (actual)" in the court's instructions meant "pure" methamphetamine based on the evidence adduced at trial of purity weights of multiple samples of gross methamphetamine. *Id.* at 211–12.  Our reasoning was rooted in the ordinary meaning of the term "actual" as it would have been understood based on the evidence presented at trial. *Id.* at 212–13.  We also noted that, even if the definitional instruction would have enhanced the jury's understanding of the term, we do not require a district court to give another instruction if it would simply give the jury a clearer understanding of the issues. *Id.* at 213.  On the merits of Mr. Woodmore's challenge, our reasoning would be the same.

A more complete explanation of why we conclude the district court did not abuse its discretion here by failing to read Mr. Woodmore's proffered definitional instruction for the "methamphetamine (actual)" term is available in *Calvin Woodmore*. *See id.* at 210–14.  Because Mr. Woodmore's challenge to the instruction is essentially identical to the one lodged in *Calvin Woodmore*, our reasoning in that case controls and we must affirm the delivery of the instruction.

---

[10]    Recall that Mr. Woodmore and Calvin had jointly submitted a proposed definitional instruction for the "methamphetamine (actual)" term in district court.

**ii**

Next, as to Mr. Woodmore's *Apprendi* challenge,[11] which he brings on plain-error review, he has not identified an error by the district court to satisfy the first prong of that review standard. With respect to Count Two, the jury was read the following elemental instruction:

> To find Defendant Early Woodmore guilty of Count Two of the Indictment, *you must be convinced that the Government has proven each of the following beyond a reasonable doubt*:
>
> **First**: Defendant Early Woodmore knowingly or intentionally distributed a controlled substance as charged;
>
> **Second**: The substance was in fact methamphetamine; and
>
> **Third**: *The amount of methamphetamine distributed by Defendant Early Woodmore was at least 50 grams.*

R., Vol. I, at 462 (emphasis added). Mr. Woodmore argues that "[t]he drug quantity of 50 grams or more of methamphetamine (actual) is a fact that increases the penalty for the distribution of methamphetamine offense charged in Count Two" and that "this drug quantity was not submitted to the jury that convicted Mr. Woodmore." Aplt.'s Opening Br. at 27–28. But later in his argument Mr. Woodmore *admits* that

---

[11]     In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. We subsequently held that "under § 841(b)(1), the quantity of drugs is a fact that may 'increase[] the penalty for a crime beyond the prescribed statutory maximum' and therefore 'must be submitted to a jury, and proved beyond a reasonable doubt.'" *United States v. Hishaw*, 235 F.3d 565, 575 (10th Cir. 2000) (alteration in original) (quoting *Apprendi*, 530 U.S. at 490).

the government presented evidence at trial to the jury that Mr. Woodmore distributed more than 50 grams of methamphetamine. *See* Aplt.'s Opening Br. at 28; R., Vol. IV, at 122, 137 (adducing evidence that Mr. Woodmore distributed 54.5 grams of pure methamphetamine in a November 6, 2018, controlled transaction with a confidential source). While Mr. Woodmore baldly labels this testimony as "uncorroborated" and "very close to the threshold line of 50 grams," Aplt.'s Opening Br. at 28, the testimony nonetheless contradicts his argument that a drug quantity exceeding 50 grams was not submitted to the jury. Furthermore, the government presented additional evidence at trial tying "439.9 gross grams, [or] approximately one pound" of pure methamphetamine to Mr. Woodmore based on phone conversations between Mr. Woodmore and Ms. Adcock as the methamphetamine was en route in the mail. R., Vol. IV, at 832; *see id.* at 856–62. Based on these two pieces of evidence, the jury could have concluded beyond a reasonable doubt that more than 50 grams of methamphetamine was distributed by Mr. Woodmore, in satisfaction of the third element in Count Two. Therefore, since Mr. Woodmore cannot even satisfy the first prong of the plain-error standard—a showing of error— his *Apprendi* challenge fails.

### iii

Mr. Woodmore also takes issue with the absence of the term "actual" in the elemental instruction for Count Two, raising a plain-error challenge. *See* Aplt.'s Opening Br. at 24 ("[T]he elemental instruction for Count Two did not include the term 'actual.'" (bold typeface omitted)); R., Vol. I, at 462. However, the court did

not err—let alone clearly or obviously err—by not including the term in the Count Two instruction. To be sure, as with Count One, the indictment used the term "actual" in Count Two. *See* R., Vol. I, at 100 (charging in Count Two that Mr. Woodmore "knowingly and intentionally distribute[d] 50 grams or more of methamphetamine (actual)"). And, as it did with the elemental language of Count One, the court *could have* chosen, in its discretion, to use the term in the elemental language for Count Two. *See id.* at 458 (using the term "actual" in the elemental language for Count One).

However, it was hardly error for the court not to do so. The statute forming the basis for the offense in Count Two does not use the term "actual." As relevant here, in order to establish a defendant's guilt of that offense, the government simply needed to prove that the defendant distributed 50 grams or more of *methamphetamine*. 21 U.S.C. § 841(b)(1)(A)(viii). Therefore, the court did not err in not including language in the instruction that did not comprise an element of the offense. That is so even if that language would have added to the jury's understanding of the offense. "We do not require a district court to give another instruction 'if it would simply give the jury a clearer understanding of the issues.'" *Murry*, 31 F.4th at 1293 (10th Cir. 2022) (quoting *Williamson*, 746 F.3d at 990).

Moreover, the discrepancy in the elemental language of Count One (using the term "actual") and Count Two (lacking the term "actual"), would not have been appreciably misleading for the jury. That is because, as we have addressed *supra* in this subpart b, and discussed at length in *Calvin Woodmore*, *see* 127 F.4th at 211–14,

43

a reasonable juror would have understood that the term "methamphetamine (actual)" in the court's instructions means "pure" methamphetamine. And, so, when the elemental instruction of Count Two referred to the term "methamphetamine," without any qualifying language indicating that it was less than pure, a reasonable jury would have understood the same substance was being discussed in both Count One and Count Two.[12] And lest it be forgotten, we do not require perfection—symmetrical or otherwise—from a district court's instructions. *See, e.g.*, *Ransom*, 642 F.3d at 1288 (noting that "[t]he instructions as a whole need not be flawless" just so long as we are "satisfied" that "the jury understood the issues to be resolved and its duty to resolve them" (quoting *Medlock*, 164 F.3d at 552)).

* * *

---

[12]     Mr. Woodmore stresses in his reply brief that "the 50-gram quantity necessary to trigger the statutory penalty of 10 years to life is indisputably to *pure* or *actual* methamphetamine, not to a mixture or substance containing methamphetamine." Aplt.'s Reply Br. at 24 (citing 21 U.S.C. § 841(b)(1)(A)(viii)). But as noted *supra*, the court did not need to include the term "actual" in Count Two's elemental instruction to apprise the jury that the count related to "pure" or "actual" methamphetamine. Moreover, insofar as Mr. Woodmore is suggesting that juror confusion could have resulted in his conviction for distributing more than 50 grams of pure methamphetamine, this suggestion is wholly belied by the record. The jury heard sufficient testimony that Mr. Woodmore distributed more than 50 grams of *pure* methamphetamine. As a result, the 50-gram element was not only "submitted to [the] jury," but it was also "proved beyond a reasonable doubt" by the government. *Apprendi*, 530 U.S. at 490. Lastly, even if there were some room for doubt (and there isn't any) regarding whether the court erred here, Mr. Woodmore still could not prevail on plain-error review because he has not demonstrated that any such error was clear or obvious. More specifically, Mr. Woodmore does not point us to any Supreme Court or Tenth Circuit precedent supporting his argument. *See* Aplt.'s Opening Br. at 25–27; *Starks*, 34 F.4th at 1157 (stating that for an error to be a clear or obvious error at prong two, "either the Supreme Court or this court must have addressed the issue" (quoting *Ruiz-Gea*, 340 F.3d at 1187)).

In sum, we reject Mr. Woodmore's various challenges related to the "methamphetamine (actual)" instruction.

## III

For the foregoing reasons, we **AFFIRM** the district court's judgment of conviction.